[No. 50848–8.   En Banc.   October 16, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. MICHAEL
KENNEDY, *Petitioner.*

2

*Jerry M. Makus, James L. Nagle,* and *Makus & Makus,* for petitioner.

*Arthur R. Eggers, Prosecuting Attorney,* and *Donald W. Schacht, Deputy,* for respondent.

UTTER, J.—Michael Kennedy appeals the Court of Appeals affirmance of his conviction for possession of over 40 grams of marijuana. He urges reversal of his conviction because the initial police stop of the car he was driving and its subsequent search was a violation of article 1, section 7 of the Washington Constitution and the fourth amendment to the United States Constitution. As such, he contends that the subsequent discovery of marijuana should have been suppressed at trial. We disagree and affirm the conviction.

At about 2:30 p.m. on September 17, 1982, Officer Leonard Adams drove by Rob Smith's house in Walla Walla. He was investigating complaints from Smith's neighbors that there was heavy pedestrian traffic in and out of the Smith house and that individuals involved stayed only for a few moments. As he drove by he saw a maroon car, with someone seated on the passenger side, parked near the Smith house.

Adams had received information from an informant that Michael Kennedy regularly purchased marijuana from Smith, that Kennedy only went to Smith's house to buy drugs, and that Kennedy usually drove either a light green pickup truck or a maroon Oldsmobile belonging to Sue Sison. He had the license checked and found out the car belonged to Sue Sison. As he sat in his car, he observed Kennedy come out of the Smith house, get into the car and drive off. He saw nothing in Kennedy's hands nor any suspicious activity but nevertheless decided to stop Kennedy to investigate because he believed Kennedy had purchased some marijuana.

After he signaled Kennedy to pull over, Adams observed Kennedy lean forward as if to put something under the seat. Once they both stopped, Adams approached the car and asked Kennedy to get out. Kennedy complied and moved to the rear of his car. Adams looked into the car to

identify the passenger and reached under the front seat. A plastic bag was found which he suspected contained marijuana and he removed it from the car. Kennedy was released after a conversation in which he stated he had purchased the marijuana at the Smith house. Kennedy was subsequently charged with possession of marijuana and moved to suppress the marijuana seized from the car. The motion was denied and he was convicted. He appealed, and the Court of Appeals upheld the conviction.

## I

Whether defendant's rights were violated begins with the stop of the car. If the initial stop was unlawful, the subsequent search and fruits of that search are inadmissible as fruits of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963); *State v. Larson,* 93 Wn.2d 638, 611 P.2d 771 (1980).

Both the State and Kennedy agree that a stop, although less intrusive than an arrest, is nevertheless a seizure and therefore must be reasonable under the Fourth Amendment and article 1, section 7 of the Washington Constitution. *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *State v. Lesnick,* 84 Wn.2d 940, 530 P.2d 243 (restraint of an individual by the police, even if not an arrest is seizure), *cert. denied,* 423 U.S. 891, 46 L. Ed. 2d 122, 96 S. Ct. 187 (1975); *Davis v. Mississippi,* 394 U.S. 721, 22 L. Ed. 2d 676, 89 S. Ct. 1394 (1969) (the Fourth Amendment applies to involuntary detention at the investigative stage). Article 1, section 7 of the Washington Constitution provides, ".No person shall be disturbed in his private affairs, or his home invaded, without authority of law." Under article 1, section 7, the concern regarding whether a defendant has been disturbed in his "private affairs" raises questions in many ways similar to the inquiries regarding the reasonableness of the stop required to be examined under *Terry.*

The term "private affairs" has been found to include automobiles and their contents. *State v. Gibbons,* 118

Wash. 171, 203 P. 390 (1922). Nevertheless, that does not altogether preclude the warrantless stop or search of an automobile. There is no historical evidence that the framers of our constitution, had they contemplated the existence of the automobile, would have completely exempted it from a reasonable search or seizure. Nothing in the language of our constitution compels a different result. Furthermore, this court has recognized, albeit in the context of arrest, that article 1, section 7 permits a warrantless search of the passenger compartment of an automobile. *State v. Stroud,* 106 Wn.2d 144, 720 P.2d 436 (1986).

Our approach is further reflected by our analysis of article 1, section 7 in *State v. Myrick,* 102 Wn.2d 506, 510, 688 P.2d 151 (1984). There we observed that the relevant inquiry under the Washington Constitution for determining whether a search has occurred is "whether the State unreasonably intruded into the defendant's 'private affairs.'" *See also State v. Simpson,* 95 Wn.2d 170, 622 P.2d 1199 (1980). We believe that this is also the proper inquiry under our constitution to determine whether an investigative stop is permissible. We note that the United States Supreme Court has approached the investigative stop from a similar perspective. Therefore our analysis begins based on the premise that we should focus on the reasonableness of the officer's activities with respect to the privacy rights thereby invaded.

In *Terry v. Ohio, supra,* the Supreme Court framed the inquiry with regard to an investigative stop as whether the officer had "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. at 21. *Terry,* however, involved firsthand observation by police of suspicious activity. In the case at bench, Officer Adams saw no suspicious activity prior to signaling Kennedy to pull over. He derived the facts from which he based his conclusion of a drug buy on informant tips and his own experience.

It is generally recognized that crime prevention

and crime detection are legitimate purposes for investigative stops or detentions. *See Terry v. Ohio, supra; Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972); 3 W. LaFave, *Search and Seizure* § 9.2 (1978). While there has been some dispute among critics, courts have not required the crime suspected or under investigation to be a felony or serious offense. *See, e.g., United States v. Cortez,* 449 U.S. 411, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981). Less than probable cause is required because the stop is significantly less intrusive than an arrest. Although some have argued otherwise, the level of articulable suspicion required for a car stop is no greater than required for a pedestrian stop. *Delaware v. Prouse,* 440 U.S. 648, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979). Because article 1, section 7 requires us to examine the reasonableness of the officer's actions in view of the facts he knew, this same analysis describes our inquiry under that provision.

As with many legal terms, although difficult to describe, articulable suspicion does have a definition developed by use of the term through application to various situations. The United States Supreme Court has suggested one must look at the totality of the circumstances. *United States v. Cortez, supra.* The *Cortez* Court described articulable suspicion as the ability to reasonably surmise from the information at hand that a crime was in progress or had occurred. Hence, the degree of probability required for the police conclusion is less in a stop situation than in an arrest. 3 W. LaFave, at 65. LaFave suggests that the standard is a substantial possibility that criminal conduct has occurred or is about to occur. We believe this to be the preferred definition. It maintains the ability of law enforcement to deter criminal conduct and yet reasonably safeguards "private affairs." When the activity is consistent with criminal activity, although also consistent with noncriminal activity, it may justify a brief detention.

The Supreme Court reached the issue of a stop based on an informant tip rather than on police observation

in *Adams v. Williams, supra.* There a police officer, acting on a tip received at the scene of the stop, approached a suspect sitting in a car and asked him to open the door. When the suspect instead rolled down the window, the officer reached to where the informant had said a gun would be, withdrew the gun and subsequently arrested the suspect. The Court found the initial approach lawful because the informant possessed the necessary indicia of reliability to justify a reasonable suspicion Adams had a gun. Several jurisdictions have adopted this analysis. *See Stone v. Patterson,* 468 F.2d 558 (10th Cir. 1972); *State v. Love,* 169 Conn. 596, 363 A.2d 1035 (1975); *State v. Brown,* 195 Neb. 321, 237 N.W.2d 861 (1976); *State v. McZorn,* 288 N.C. 417, 219 S.E.2d 201 (1975), *vacated in part,* 428 U.S. 904, 49 L. Ed. 2d 1210, 96 S. Ct. 3210 (1976).

Two Washington cases have also addressed the issue of a stop of a suspect based on informant tips. *State v. Sieler,* 95 Wn.2d 43, 621 P.2d 1272 (1980) and *State v. Lesnick, supra.* These cases follow an analysis similar to that of the United States Supreme Court, permitting police to detain an individual only if the officer has a well founded suspicion, based on objective facts, that the person is connected to potential or actual criminal activity. *Sieler* held that a tip may justify a detention if it possesses sufficient indicia of reliability, *i.e.,* the circumstances suggest the informant's reliability or there is some corroborative observation which suggests the presence of criminal activity or that the information was obtained in a reliable fashion.

The *Lesnick* court applied a similar analysis holding a detention is lawful if based on an informant's tip which demonstrates some indicia of reliability providing an objective measure of reasonableness. The court was careful to emphasize "no single rule can be fashioned to meet every conceivable confrontation between the police and citizen. Evaluating the reasonableness of the police action and the extent of the intrusion, each case must be considered in light of the particular circumstances facing the law enforcement officer." *State v. Lesnick,* 84 Wn.2d at 944. This is

consistent with our approach to article 1, section 7 which requires us to look at the reasonableness of the officer's actions to determine whether "private affairs" were disturbed.

The case at bench falls squarely within the *Adams v. Williams, supra, Sieler* and *Lesnick* analyses. Officer Adams testified at the suppression hearing that he had received tips from the police informant for several months and that the informant was reliable. He further testified that one tip resulted in the issuance of a warrant and subsequent conviction. This satisfies the "indicia of reliability" test set forth in *Adams, Sieler* and *Lesnick*. However, in addition, Officer Adams had firsthand corroboration for two of the informant's facts. He saw Kennedy come out of the Smith house and enter a car described by the informant.

Moreover, the police had another source of information—the neighbors' complaints about the frequent foot traffic to the Smith house. The neighbors' information does not require a showing of the same degree of reliability as the informant's tip since it comes from "citizen" rather than "professional" informants. *See State v. Chatmon,* 9 Wn. App. 741, 746, 515 P.2d 530 (1973); *State v. Riley,* 34 Wn. App. 529, 532–33, 663 P.2d 145 (1983). In addition, Officer Adams had been with the Walla Walla Police Department for 20 years and had been involved in over 100 drug–related investigations over the previous 5 years. Given his extensive knowledge of and experience regarding drug trafficking, this tip can be seen as corroboration of the other tip.

The two independent sources of information each provide support for the other's veracity. On the basis of the two tips, the officer's experience with drug investigations, and his own eyewitness corroboration of some of the information, Officer Adams had sufficient articulable suspicion to stop Kennedy as he drove away from the Smith house. Adams' stop of Kennedy was reasonable under article 1, section 7 and under the fourth amendment to the United States Constitution. The stop, although intrusive, was limited and was warranted by the facts known to Adams and

the reasonable conclusions he drew from them.

## II

No search can be reasonable if the initial detention is unlawful. However, the mere lawfulness of a detention does not automatically render a subsequent search reasonable under article 1, section 7 and the Fourth Amendment. Because Adams' stop of Kennedy was based upon articulable suspicion, and therefore proper, the question of whether his subsequent intrusion into Kennedy's car was also lawful must be examined.

■ Given that the stop was lawful, as it was here, Officer Adams' request that Kennedy step out of the car did not unjustifiably intrude on Kennedy's reasonable expectation of privacy. Under similar circumstances, the United States Supreme Court has found such an intrusion de minimis. *Pennsylvania v. Mimms,* 434 U.S. 106, 54 L. Ed. 2d 331, 98 S. Ct. 330 (1977). Washington courts have also subscribed to this analysis. *See, e.g., State v. Sykes,* 27 Wn. App. 111, 115–16, 615 P.2d 1345 (1980). We see no reason to do otherwise in this case.

The Court of Appeals upheld the search of Kennedy's car on a "plain view" analysis. We believe, however, that the doctrine was incorrectly applied in this instance without further analysis. As we have explained in past cases, "plain view" applies to a situation where an officer inadvertently sees an item immediately recognizable as contraband, after legitimately entering an area with respect to which a suspect has a legitimate expectation of privacy. *State v. Seagull,* 95 Wn.2d 898, 901, 632 P.2d 44 (1981). The "plain view" doctrine, however, does not justify the initial intrusion into the protected area. *State v. Seagull, supra; accord, State v. Chrisman,* 100 Wn.2d 814, 819, 676 P.2d 419 (1984); *Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971). The officer's right to seize the evidence "must turn on the legality of the intrusion that enable[d him] to perceive and physically seize the property in question." *Texas v. Brown,* 460 U.S. 730, 737,

75 L. Ed. 2d 502, 103 S. Ct. 1535 (1983). *See also Payton v. New York,* 445 U.S. 573, 587, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980) (an object in plain view cannot be seized on that basis alone, if it is "situated on private premises to which access is not otherwise available for the seizing officer"). The validity of the initial stop does not justify the intrusion. Absent a plain view exception, the seizure is invalid unless it occurred within the context of another exception to the warrant requirement.

Because there is some confusion we take this opportunity to note the difference between "plain view" and "open view." Whereas a "plain view" situation involves an officer viewing an item *after a lawful intrusion into* a constitutionally protected area, "open view" involves an observation from a nonconstitutionally protected area. *State v. Seagull,* 95 Wn.2d 898, 901–02, 632 P.2d 44 (1981). Hence, if an officer, after making a lawful stop, looks into a car from the outside and sees a weapon or contraband in the car, he has not searched the car. Because there has been no search, article 1, section 7 is not implicated. Once there is an intrusion into the constitutionally protected area, article 1, section 7 is implicated and the intrusion must be justified if it is made without a warrant. While the terms "open view" and "plain view" were adopted in cases interpreting the demands of the fourth amendment to the United States Constitution and not specifically addressed to our state constitution, the concerns they address are also appropriate in discussing when persons may be disturbed in their "private affairs." This was not an "open view" situation as the contraband was not visible from outside the car.

Here the search was justified under a number of exceptions to the traditional warrant requirements. The same concern that justifies the frisk under a Fourth Amendment analysis, possible danger to the officer, justifies it under article 1, section 7. First, when an officer stops a person, even if just to question him, the officer may, under certain circumstances, frisk the suspect as a matter of self–protection. This "stop and frisk" analysis was first adopted in

*Terry v. Ohio, supra.* In fact, most of the cases developing the *Terry* reasoning have focused on the frisk rather than the stop portion of the analysis. The questions raised with regard to the frisk concern how much suspicion the officer must have that the suspect is armed and dangerous, whether the test is objective or subjective, and to what extent the officer may search the suspect, containers and the surrounding area.

An officer conducting an investigative stop may be endangered not only by the suspect but by companions of the suspect as well. Some courts have held that an officer may frisk a companion if the officer may lawfully frisk the driver, *United States v. Berryhill,* 445 F.2d 1189 (9th Cir. 1971), especially where the companion is in the suspect's car, *United States v. Vigo,* 487 F.2d 295 (2d Cir. 1973).

Turning to the facts of the present case, Adams saw a furtive gesture sufficient to give him an objective suspicion that Kennedy was secreting something under the front seat of the car. From his vantage, in his own car behind Kennedy's, he had no way of knowing what Kennedy was hiding. When he had Kennedy outside the car, he did not frisk him, as he could have had he suspected Kennedy might be armed. However, there remained the gesture, the unknown object under the front seat, and the passenger inside the car who had easy access to the object.

Recently, this court set out the parameters of a search incident to arrest. In *State v. Stroud,* 106 Wn.2d 144, 720 P.2d 436 (1986), we articulated a rule to aid law enforcement officers having to determine the scope of an automobile search incident to arrest. We weighed the safety of the officers, the State's legitimate interest in preserving evidence of a crime, and the heightened privacy interests afforded Washington citizens under our state's constitution. Because an officer on the street does not have the luxury of time necessary to evaluate these disparate interests, we opted for a clearer rule: upon an arrest, an officer may search for weapons or destructible evidence in the vehicle's passenger compartment as well as in any unlocked contain-

ers or unlocked glove compartments. 106 Wn.2d at 152.

While *Stroud* provides some guidance, not all the policy concerns we addressed there exist in the present case. Hence, we must view the scope of the search somewhat differently. In contrast to an arrest, a *Terry* stop does not present the same dangers to the police officer or to evidence of a crime. No evidence could be lost, because, without some further predicate, no evidence could be seized. Because the risk to a *Terry* suspect is substantially less than that presented a *Stroud* arrestee, the risk to the officer is correspondingly reduced. Given the absence of a state interest in evidence and this reduced risk to the officer, the degree of intrusion into an admittedly private area—the passenger compartment of a car—should be reduced. To hold otherwise would make the scope of a *Terry* stop coterminous with that of an arrest, a conclusion we find unsupportable under article 1, section 7 of the Washington Constitution. Moreover, raising the stakes of a *Terry* stop would unnecessarily increase the volatility in that police–citizen encounter.

Hence, in this context, we find Professor LaFave's guidelines to be appropriate. The scope of the search should be sufficient to assure the officer's safety. This means that the officer may search for weapons within the investigatee's immediate control. We also recognize that such a limited search applies to any companion in the car because that person presents a similar danger to the approaching officer. The front seat of the car is in the immediate control of a passenger seated next to the driver. Consequently, a search in that area to discover whether the suspect's furtive gesture hid a weapon under the front seat is similar to a *Terry* frisk where an officer may frisk a suspect to protect himself from danger.

In light of these principles, we agree that it was reasonable for Adams to conduct a limited search for weapons given his objective reasons for doing so. It would be unreasonable to limit an officer's ability to assure his own safety. The apparent policy reasons behind article 1, section 7 of

the Washington Constitution, as well as our recent *Stroud* decision, allow an officer to make a limited search of the passenger compartment to assure a suspect person in the car does not have access to a weapon within the suspect's or passenger's area of control. There is no argument made that this intrudes on the protected "private affairs" of a driver or passenger.

Once the officer here was legitimately within the automobile and legitimately within the area of the front seat, the discovery of the contraband fell within the "plain view" doctrine. The officer had to have a prior justification for the intrusion; discovery of the contraband had to be inadvertent and he had to immediately recognize the item as contraband. *Coolidge v. New Hampshire, supra; State v. Lair,* 95 Wn.2d 706, 714, 630 P.2d 427 (1981).

The first requirement was met inasmuch as the officer's intrusion into the car was reasonable under article 1, section 7 and its attendant stop and frisk analysis. Second, the discovery was inadvertent since Adams came upon the contraband while looking for a weapon under the front seat. Third, once he had the bag in his hand, Adams could immediately conclude, based on his own prior experience investigating narcotics and the information he had about the Smith household and about Kennedy, that the bag contained contraband. Hence, the seizure was justified under the "plain view" doctrine.

Officer Adams' stop of Kennedy was reasonable under article 1, section 7 of the Washington Constitution and the fourth amendment to the United States Constitution. His subsequent search for a weapon under the front seat was also reasonable under those provisions. His inadvertent discovery of marijuana was therefore lawful and the subsequent conviction for possession of marijuana is affirmed.

BRACHTENBACH, ANDERSEN, GOODLOE, and DURHAM, JJ., concur.

DORE, J., dissents.

14

DOLLIVER, C.J. (dissenting)—The majority holds the seizure of defendant Michael Kennedy did not violate the narrowly drawn warrantless search and seizure exception set forth in *Terry v. Ohio,* 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The majority also holds the informant's tip on which the seizure was based was predicated upon articulable suspicion. In my opinion, the majority has incorrectly perceived the scope of a permissible *Terry* stop and unnecessarily relaxes our well established standards governing articulable suspicion for informant tips. I therefore dissent on the grounds that the seizure of defendant Kennedy violated the fourth amendment to the United States Constitution and article 1, section 7 of the Washington State Constitution. Since the seizure of Michael Kennedy was unlawful, the evidence seized under the plain view doctrine must be excluded. *State v. Lesnick,* 84 Wn.2d 940, 942, 530 P.2d 243, *cert. denied,* 423 U.S. 891 (1975). I would reverse the trial court.

I

Fifteen years ago, Judge Henry J. Friendly prophetically warned that the stop and frisk exception to the Fourth Amendment in *Terry* had the grave potential for abuse in the case of possessory crimes. *Williams v. Adams,* 436 F.2d 30, 38 (2d Cir. 1970) (Friendly, J., dissenting), *rev'd on rehearing,* 441 F.2d 394 (1971), *rev'd,* 407 U.S. 143 (1972). The present case is just such a situation. The facts of this case are not amenable to a *Terry* analysis. The majority regrettably puts its seal of approval on a seizure which, although fruitful in result due to the plain view doctrine, is inconsistent with the purpose for which *Terry* was envisioned.

The *"Terry*-type stop" has its roots in the principle of crime prevention. 3 W. LaFave, *Search and Seizure* § 9.2, at 19 (1978). As stated by the United States Supreme Court, the purpose of *Terry* was to enable "a police officer . . . *in appropriate circumstances and in an appropriate manner* [to] approach a person for purposes of investigating

possibly criminal behavior even though there is no probable cause to make an arrest." *Terry,* at 22.

In the almost two decades since *Terry,* there has been a gradual expansion of its original limited purpose of crime prevention to crime detection and investigation. 3 W. LaFave § 9.2, at 21 (1978). In *Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972), for example, the Court upheld a *Terry* search of an individual who was suspected of being in possession of a weapon and contraband. Although *Adams* may be characterized as a case expanding *Terry* stops into the sphere of crime detection, the Court nevertheless noted the rationale of the *Terry* stop:

> A brief stop of a suspicious individual, *in order to determine his identity or to maintain the status quo momentarily while obtaining more information,* may be most reasonable in light of the facts known to the officer at the time.

(Italics mine.) *Adams,* at 146.

The "maintaining the status quo" rationale runs throughout post–*Terry* cases. In *United States v. Cortez,* 449 U.S. 411, 66 L. Ed. 2d 621, 101 S. Ct. 690 (1981), for example, border patrol officers had been tracking an unknown individual who wore shoes which left a distinctive chevron mark in the earth near the Mexico–United States border. The individual, referred to as "Chevron", was suspected of operating a guide service in which he would smuggle illegal aliens into the United States from Mexico. Elaborate police work led the officers to believe Chevron would appear at a certain time and place with a group of illegal aliens. The officers set up a stakeout and stopped the only vehicle which was leaving this particular area. At the outset of its opinion upholding a *Terry* stop of Chevron's car, the Court stated:

> The limited purpose of the stop in this case was to question the occupants of the vehicle about their citizenship and immigration status and the reasons for the

round trip in a short timespan in a virtually deserted area.

*Cortez,* at 421.

In *United States v. Brignoni–Ponce,* 422 U.S. 873, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975), the Court upheld the right of the border patrol to stop randomly cars which reasonably appear to be suspicious for the limited purpose of questioning occupants as to their citizenship. In granting this right, the Court again stressed the purpose of the stop was not to search the car but was to "question the driver and passengers about their citizenship and immigration status, and he [a member of the border patrol] may ask them to explain suspicious circumstances . . ." *Brignoni–Ponce,* at 881–82. *Accord, United States v. Hensley,* 469 U.S. 221, 227–29, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985) (police officers may conduct *Terry* stop of individual suspected of participating in robbery 2 weeks earlier based on "wanted flyer" for the purpose of asking questions and securing identification).

Our cases interpreting the Fourth Amendment and article 1, section 7 of the Washington State Constitution similarly confirm the limited purpose of a *Terry* stop to be for stopping and questioning. In *State v. Williams,* 102 Wn.2d 733, 689 P.2d 1065 (1984), for example, one factor which led the court to invalidate the *Terry* seizure of a person who was in the area of a burglary was the fact that he had been detained not for questioning but so the police could gather evidence against him. Similarly, in *State v. White,* 97 Wn.2d 92, 640 P.2d 1061 (1982), we invalidated a "stop and identify" statute on the grounds it gave the police more authority to stop, detain, and question citizens than was provided for by *Terry.*

That the purpose of a *Terry* stop is for limited investigatory questioning is further demonstrated by the principle that once the stopping officer has ascertained the identity of the suspect and the nature of his conduct, that officer may not continue to question the suspect in an exploratory manner. The rationale for this principle is that the war-

rantless stop becomes "unreasonable" when the question is no longer founded on a reasonable suspicion. *See United States v. Kenney,* 573 F.2d 657 (9th Cir. 1978); *Commonwealth v. Ferrara,* 376 Mass. 502, 381 N.E.2d 141 (1978); *Madison v. State,* 171 Ind. App. 492, 357 N.E.2d 911 (1976); *People v. Carrasquillo,* 54 N.Y.2d 248, 429 N.E.2d 775, 445 N.Y.S.2d 97 (1981).

The purpose of the minimally intrusive *Terry* stop, therefore, is to allow the police to make an intermediate response to a situation for which there is no probable cause to arrest but which calls for further investigation. As the *Terry* Court noted, a temporary seizure must be "reasonably related in scope to the justification for [its] initiation." *Terry,* at 29. *Accord, State v. Williams,* at 740 ("purpose of the stop [must be] related to petitioner's detention"); *Dunaway v. New York,* 442 U.S. 200, 60 L. Ed. 2d 824, 99 S. Ct. 2248 (1979) (concept of stop is not broad enough to encompass all detentions short of arrest).

The logical corollary to this is that if, at its inception, there is nothing which reasonably and in good faith can be ascertained during a *Terry* stop, the stop is unreasonable. A *Terry* stop was never envisioned to be a fishing expedition for evidence. The seizure must relate to and further the purpose for which the seizure was originally created: preventing a crime, ascertaining information, identifying the suspect, or otherwise maintaining the status quo. *See State v. Williams,* at 738.

The reason it is necessary to limit strictly the number of circumstances under which a *Terry* stop may be used as an investigative tool is because it is an exception to the general rule requiring search warrants and probable cause. *See* Williamson, *The Dimensions of Seizure: The Concepts of "Stop and Arrest",* 43 Ohio St. L.J. 771, 805 (1982). Although not always clear, there is a line separating a legitimate *Terry* detention from an arrest. A *Terry* detention becomes unlawful when no justification exists at its inception or when it becomes a method to procure self–incriminating interrogation in a custodial setting. In that event, a

*Terry* detention is no longer justified as a means of "preserving the status quo". *State v. Williams,* at 745 (Dimmick, J., dissenting) (citing *Michigan v. Summers,* 452 U.S. 692, 701–02, 69 L. Ed. 2d 340, 101 S. Ct. 2587 (1981)). *See also* Williamson, *The Dimensions of Seizure,* at 813.

The present case is a striking example of a *Terry* stop which does not appear to have been made in furtherance of its allowable purpose. Since Detective Sergeant Leonard L. Adams had been investigating the defendant for several months prior to the *Terry* stop, had known the defendant for approximately 13 years, and unmistakably knew who he was at the time of the stop, the "identification" function of *Terry* could not possibly have been furthered by the seizure. In addition, since Adams had received information from at least two sources suggesting the defendant purchased marijuana from Smith, the "explanation" function of *Terry* similarly could not have been furthered.

The seizure of Kennedy cannot be characterized properly as a *Terry* stop; rather, it was a warrantless arrest. The motive for the seizure appears to have been the fortuitous possibility that contraband would appear in plain view, there would be a furtive gesture, or the defendant would confess his guilt. This court should not condone seizures on fortuity.

The majority asserts the search in the instant case has support in *Adams v. Williams,* 407 U.S. 143, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972). In *Adams* a police officer received information from a reliable informant that the defendant, who was sitting in his car, was armed and in possession of heroin. Immediately thereafter, the officer approached the car in which the defendant was sitting and performed a *Terry* stop and frisk. I believe the majority reads *Adams* too broadly. It only gives the police the authority to respond to situations which unexpectedly arise and which require immediate police response. The police officer in *Adams* received information the defendant was in actual possession of an unlawful substance. No such exigency exists here. Detective Sergeant Adams was not acting

on a "hot" tip that the defendant was committing or was about to commit a crime. Rather, he was acting upon information that the defendant had a pattern of committing and would at some future time commit a crime. *Accord, People v. Tooks,* 403 Mich. 568, 271 N.W.2d 503 (1978) (police investigation followed immediately after receipt of information that defendant carried a weapon).

In disapproving of the *Terry* stop in this case, I do not intend to discourage law enforcement officers from acting on reports of suspicious activity which, due to their training, suggest criminal conduct is afoot. I do not approve, however, of the use of a *Terry* stop in a case in which there was information only that a crime would be committed in the future, the officer personally does not witness the commission of the crime, the "suspect" is known to the police, and no exigency exists justifying the suspect's immediate detention.

Defendant Kennedy was under investigation and his arrest could have been secured through proper police channels, *e.g.,* the warrant procedure, when the time was ripe. A *Terry* stop is a limited investigatory and preventative tool. It was never intended to be a substitute for a search for which there is no probable cause to obtain a warrant.

## II

I likewise dissent to the majority's conclusion that the seizure of defendant Kennedy was based on an articulable suspicion. An informant's tip must have a "sufficient 'indicia of reliability.'" *State v. Sieler,* 95 Wn.2d 43, 47, 621 P.2d 1272 (1980) (citing *Adams v. Williams, supra; State v. Lesnick,* 84 Wn.2d 940, 943, 530 P.2d 243, *cert. denied,* 423 U.S. 891 (1975)). Reliability is resolved in a 2–pronged analysis. The informant must be reliable or there must be some corroborative observation which suggests either the presence of criminal activity or that the informant's information was obtained in some reliable fashion. *Sieler,* at 47.

This case involves two informants, the neighbors who complained of pedestrian traffic at the Smith home, and the

unidentified informant. While reliability is not usually a concern with regard to citizen tips, the information offered by citizens must nevertheless be supported by other facts. *State v. Chatmon,* 9 Wn. App. 741, 746–47, 515 P.2d 530 (1973). In the present case, the record does not contain the names of the neighbors or when they complained. The record does not indicate the neighbors saw the *defendant* leaving the Smith home. Furthermore, the reports by the neighbors of high pedestrian traffic into the Smith home were not corroborated independently by police observation. While high pedestrian traffic may, *to the trained eye of the police,* indicate drug dealing activity, complaints by citizens of innocuous conduct must be corroborated by police observation prior to a seizure. W. Ringel, *Searches and Seizures, Arrests and Confessions* § 13.4(b) (1984).

The majority's analysis of the reliability of the informant's tip is likewise misplaced. Admittedly, the informant was known to Adams and that person apparently provided reliable information in the past as to a different defendant. Thus, the "veracity" prong of the reasonable suspicion test is satisfied. Nevertheless, the informant's tip must be based on *specific* and *articulable facts. United States v. Hensley,* 469 U.S. 221, 227, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985); *Sieler,* at 48; *State v. Jackson,* 102 Wn.2d 432, 437, 688 P.2d 136 (1984). In *Hensley,* for example, the Court held a police officer, acting on a "wanted poster" issued by a different police department, had reasonable suspicion to perform a *Terry* stop on an individual who matched the person contained in the poster. In upholding the *Terry* stop, however, the Court noted numerous times that the wanted poster, though based on an informant tip, was issued on the basis of specific and articulable facts. *Hensley,* at 232–33. Specifically, the *Hensley* Court stated that the informant possessed a "wealth of detail concerning the robbery" and had participated tangentially in the robbery. *Hensley,* at 234.

Furthermore, in *Sieler* we held a tip by an informant, even though named, did not establish reasonable suspicion

when the informant merely reported that a drug transaction had just taken place and identified the car in which the transaction allegedly took place. We noted that the informant did not state what he saw nor did the police independently corroborate the informant's observations. *Sieler,* at 49.

In the present case, the informant did not admit participation in the crime. The only information the record contains as to *how* the informant arrived at the conclusion the defendant regularly purchased contraband from Smith is that the defendant told him so. While hearsay may under certain circumstances satisfy the credibility prong of the *Aguilar–Spinelli* test (*Aguilar v. Texas,* 378 U.S. 108, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964); *Spinelli v. United States,* 393 U.S. 410, 21 L. Ed. 2d 637, 89 S. Ct. 584 (1969)), the hearsay must be corroborated by knowledge of the *essential* facts connecting the defendant with the crime. *State v. Jackson,* at 437–38 (citing *United States v. Carmichael,* 489 F.2d 983, 986–87 (7th Cir. 1973); *State v. Yaw,* 58 Hawaii 485, 572 P.2d 856 (1977)). Hearsay is not corroborated by mere evidence the informant has some knowledge of the suspect's affairs.

The only "facts" supporting the hearsay are that the defendant (1) regularly purchased drugs from Smith; (2) used a certain car for pickups; and (3) never socialized with Smith. These "facts" do not constitute a "wealth of detail", *Hensley,* at 234, nor do they evince personal knowledge of the defendant's role in this crime. On the contrary, they constitute "'innocuous details', commonly known facts or easily predictable events . . ." *State v. Jackson,* at 438; *State v. Sieler,* at 50. Furthermore, the tip was not corroborated by Adams' personal observation since he did not see the defendant leave Smith's home with anything in his hands. He observed only the nonincriminating act of defendant getting into his car. *Sieler,* at 50. *See also People v. Tooks,* 403 Mich. 568, 583, 271 N.W.2d 503 (1978) (Kavanagh, C.J., dissenting). Finally, we do not know when the tip was received. It very well may have been stale at the

time at which it was executed. *State v. Higby*, 26 Wn. App. 457, 613 P.2d 1192 (1980). The only real evidence of informant credibility appears to be Adams' assertion that his informant was correct in the past and was known to him personally. This dangerously reduces the credibility prong of *Aguilar* to nothing more than nonanonymity. *See* 3 W. LaFave, *Search and Seizure* § 9.3, at 97–98 (1978).

Although impliedly acknowledging the suspicion on which the *Terry* stop was based falls short of that required by *Sieler* and *State v. Lesnick*, 84 Wn.2d 940, 530 P.2d 243, *cert. denied*, 423 U.S. 891 (1975), the majority nevertheless holds that the tip was reliable because there was corroborating evidence. The primary corroborating evidence cited by the majority is the "fact" that Smith's neighbors had been complaining of high pedestrian traffic in the area. Majority opinion, at 8.

In holding the neighbors' complaints corroborated the informant tip, the majority states it is merely applying a "substantial possibility" test to discern whether an unlawful act has taken place. Majority opinion, at 6 (citing 3 W. LaFave, § 9.3, at 65). The majority seems to suggest that in the area of *Terry* stops based on informant tips, LaFave's "substantial possibility" test replaces the *Aguilar–Spinelli* test as the standard by which the tip is judged. The majority has misread this commentator's application of the substantial possibility test.

The substantial possibility test was proposed by LaFave as a standard which satisfies *Terry's* language allowing a police officer to initiate a *Terry* stop if he reasonably believes a crime "*may* be afoot", *i.e.*, a crime has occurred, is occurring or is about to occur. 3 W. LaFave § 9.3, at 65. As I read this commentator, the test was suggested as a standard by which police could react to situations in which they personally observed unlawful conduct; it was never intended by LaFave to replace the *Aguilar–Spinelli* test as a test which applies to suspicions which are based solely on informant tips. The examples cited by LaFave all involve direct police observation of crimes taking place. Further-

more, in his discussion of *Terry* stops based on informant tips, LaFave questions the relaxation by the Supreme Court of the *Aguilar–Spinelli* test in the stop and frisk context. 3 W. LaFave § 9.3, at 98. The majority erroneously applies LaFave's "substantial possibility" test to analyze the reliability of the informant's information when the test rather appears to be set forth as a standard to measure a police officer's belief that a crime had just occurred.

Although not conceding it, the majority rejects the use of the *Aguilar–Spinelli* test and is in actuality applying a "totality of the circumstances" test to analyze level of suspicion necessary to justify a *Terry* stop. In the *Terry* context, this "test" first appeared in *Adams v. Williams,* 407 U.S. 143, 147, 32 L. Ed. 2d 612, 92 S. Ct. 1921 (1972), in which the Court held that *Terry* stops could be based on hearsay informant tips so long as the circumstances generally corroborated the hearsay tip. The Court noted:

> But in some situations—for example, when the victim of a street crime seeks immediate police aid and gives a description of his assailant, or when a credible informant warns of a specific impending crime—the subtleties of the hearsay rule should not thwart an appropriate police response.

There apparently exists a split of federal authority on the question of whether the *Aguilar–Spinelli* test applies to *Terry* stops. *Compare United States v. Gorin,* 564 F.2d 159, 161 (4th Cir. 1977) ("[t]he high standard for informant reliability established in *Aguilar* and *Spinelli* simply does not apply when the detectives needed only 'reasonable suspicion,' rather than 'probable cause,' to justify their actions"), *cert. denied,* 434 U.S. 1080 (1978) *and United States v. Hernandez,* 486 F.2d 614 (7th Cir. 1973) (same), *cert. denied,* 415 U.S. 959 (1974) *with United States v. McLeroy,* 584 F.2d 746, 748 (5th Cir. 1978) (anonymous informant tip does not create reasonable suspicion) *and United States v. Robinson,* 536 F.2d 1298 (9th Cir. 1976) (same). The United States Supreme Court has not, to date, reviewed the question although there exist two dissents

from the Court's denial of review of cases presenting the issue. *See United States v. White,* 648 F.2d 29 (D.C. Cir.), *cert. denied,* 454 U.S. 924 (1981) (White, J., dissenting) and *State v. Jernigan,* 377 So. 2d 1222 (La. 1979), *cert. denied,* 446 U.S. 958 (1980) (White, J., dissenting). *Cf. State v. Jackson,* 102 Wn.2d 432, 688 P.2d 136 (1984) (court refuses to relax the stringent *Aguilar–Spinelli* requirements in the case of a search warrant).

In cases, such as this one, in which an informant tip is based on hearsay, unsupported by specific and articulable facts, neither based on nor corroborated by the informant's intimate knowledge of the incriminating details, and not corroborated by direct police observation of unlawful conduct, the strict *Aguilar–Spinelli* test should not be relaxed to a nebulous "totality of the circumstances" test. Under these circumstances, and generally in possession cases, the risk of a fabricated informant tip bolstered by hindsight is simply too great. *See* 3 W. LaFave § 9.3, at 102. I believe we rejected the totality of the circumstances test in *Sieler,* where we cited with approval both *McLeroy* and a leading commentator criticizing the abandonment by *Adams v. Williams* of the *Aguilar–Spinelli* test in the *Terry* stop context. *State v. Sieler,* 95 Wn.2d 43, 48, 621 P.2d 1272 (1980) (citing 3 W. LaFave § 9.3, at 99–100). *See also United States v. Hensley, supra* (an unidentified informant's tip was reliable and credible since the informant was both a participant in the crime and possessed a "wealth of details" about the crime).

Furthermore, we have noted in the past that the seriousness of the crime is a consideration in the question of whether the strict requirements for informant reliability should be relaxed. *State v. Lesnick,* 84 Wn.2d 940, 944–45, 530 P.2d 243, *cert. denied,* 423 U.S. 891 (1975), *quoted in* 3 W. LaFave § 9.3, at 103 (informant tip about illegal gambling games). This reflects the principle in search and seizure law that a warrantless intrusion into the privacy of our citizens becomes less justified as the importance of the governmental interest diminishes. *See United States v.*

*Hensley,* 469 U.S. 221, 228, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985) (governmental interest in preventing crime stronger than interest in investigating already completed crime, and thus, *warrantless* seizure more justifiable in former). The crime at issue in this case, possession of marijuana, is not so serious as to warrant a warrantless seizure.

However, even if a totality of the circumstances test is appropriate in analyzing *Terry* seizures, I disagree with the majority's conclusion that the complaints by the neighbors satisfactorily corroborate the informant's tip. The neighbors' complaints do not reliably corroborate the tip because the neighbors' complaints do not specifically mention the defendant, there is no indication when the complaints were made, and the complaints were not independently corroborated by the police. *State v. Sieler,* at 48–49. *Cf. People v. Tooks,* 403 Mich. 568, 271 N.W.2d 503 (1978) (tip by anonymous citizen sufficient for *Terry* purposes since neighbor described suspect with specificity and information was independently verified by police on the scene). Without casting doubt on the integrity of Detective Sergeant Adams, there is simply too much risk of fabrication in this evidence. *See* 3 W. LaFave § 9.3, at 102.

## III

In the interest of articulating clearly search and seizure laws under which our law enforcement officers may guide their actions, I summarize what I believe are the rules governing a seizure such as the one in the present case. Information received from an unidentified source stating a person has committed, is committing, or will commit a crime, must meet the reliability and credibility criteria set forth in part II of this opinion. Summarizing these criteria, the information must be based on specific and articulable facts which are (1) corroborated by a wealth of details describing noninnocuous conduct, or (2) corroborated by independent observation by the police. If these criteria are met, an officer may initiate a *Terry* stop.

Even though the above criteria may be satisfied, a *Terry*

stop is not always a permissible intrusion. In the case of an ongoing investigation of a person for whom there exists a suspicion that the person is regularly engaged in an unlawful activity, the officer may only perform a *Terry* stop of that person under the following circumstances: if the officer reasonably and in good faith believes the stop will provide information not currently possessed regarding the person's role in the suspected crime. *Terry* stops may not be initiated upon an officer's mere suspicion, as opposed to probable cause belief, that a person is in possession of an unlawful substance. In cases such as the present one where the defendant's identity and the nature of his allegedly illegal conduct are known to the police officer, a *Terry* stop may not be conducted. Rather, the appropriate police response is to corroborate personally or otherwise investigate the suspicion until evidence develops which is sufficient to procure a search or arrest warrant.

PEARSON and CALLOW, JJ., concur with DOLLIVER, C.J.

CALLOW, J. (dissenting)—I would hold that requiring the defendant to move from his seat and searching the car for items not in plain view went beyond the proper purposes of a *Terry* stop.