COURT OF APPEALS DIV I
2014 APR 28 AM 10: 23



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 69607-6-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | |
| | ) | |
| KENNETH DAJION KELLY, | ) | UNPUBLISHED |
| | ) | |
| Appellant. | ) | FILED: April 28, 2014 |
| | ) | |

Cox, J. — Kenneth Kelly appeals his conviction for unlawful possession of a firearm, contending the trial court erred by denying his motion to suppress evidence of the firearm. Because the stop of the vehicle in which he was a passenger was not pretextual, he was lawfully seized, and the firearm within his reach was also lawfully seized, we affirm.

In the early morning of February 26, 2012, Seattle Police Detectives Josh Rurey and Robert Thomas were patrolling the streets in a patrol car bearing subdued markings on its side. The detectives, in full uniform, were assigned to the gang unit.

As the detectives traveled northbound on 51st Avenue South, a Mercedes sedan with tinted side windows drew their attention when it conducted a U-turn in

front of them. At approximately 12:42 a.m., Detective Rurey entered the Mercedes' license plate number into his computer. He learned that the title to this recently sold vehicle had not been transferred within the requisite 45 day time limit.[1] The detectives decided to turn their patrol car around and stop the Mercedes for this traffic violation. However, while the detectives were obtaining the information from their computer, they lost sight of the Mercedes.

Once the detectives turned around to follow the Mercedes, they saw that the vehicle had driven a significant distance in a short amount of time. It was apparent to them that the vehicle had been traveling at a high rate of speed over the posted speed limit. Although the detectives drove over the speed limit as they pursued the Mercedes, they were initially unable to close in on the vehicle.

At approximately 12:45 a.m., the detectives caught up to the Mercedes when it stopped at a traffic light. The detectives pulled up behind the vehicle at the light. When the traffic light turned green, Detective Thomas activated the patrol vehicle's emergency lights. The Mercedes turned left at the intersection and came to a stop.

Detective Thomas headed toward the driver's side of the Mercedes to speak to the driver while Detective Rurey approached the passenger's side. At this time, the driver voluntarily opened the driver door. But because of the tinted windows and the dark outdoor surroundings, the detectives could not see into the interior of the vehicle. As a result, to ensure officer safety, Detective Rurey opened the rear passenger door and Detective Thomas asked the driver to roll

---

[1] Former RCW 46.12.101(6); RCW 46.12.650(7).

down the vehicle's windows. The driver rolled down the window on the driver's door. From their vantage points, the detectives observed two occupants in the back seat of the vehicle, a driver, and a front seat passenger. Kelly was one of the two passengers in the back seat. The detectives did not recognize the occupants.

The detectives noticed that Kelly and the other back seat passenger were not wearing seat belts. Detective Rurey consequently asked them to identify themselves. Kelly provided his name and date of birth.

Meanwhile, Detective Rurey stood outside of the Mercedes and scanned its interior through the open rear passenger door to look for potential threats. With his flashlight he noticed an object in the front passenger seat's back pocket that he immediately recognized as the handle of a handgun. It was situated directly in front of Kelly and within his reach. Detective Rurey drew his weapon, alerted Detective Thomas, and ordered the occupants to place their hands on the ceiling. The detectives then called for backup units.

When additional gang unit officers arrived at the scene, they removed the occupants from the Mercedes. They first took Kelly out of the vehicle, lay him on the ground, and handcuffed him. Detective Rurey then reached into the vehicle and removed the gun.

Once the detectives learned that Kelly had been previously convicted of manslaughter, they arrested him for unlawful possession of a firearm. The detectives did not arrest anyone else. Detective Thomas later cited the driver for traffic violations.

The State charged Kelly with one count of unlawful possession of a firearm in the first degree. Pursuant to CrR 3.6, Kelly moved to suppress all evidence against him, arguing that Detectives Rurey and Thomas conducted an unlawful search and seizure. Kelly contended that he was unlawfully seized because the stop was pretextual, that the detectives lacked sufficient justification to request his identification, and that the detectives' discovery of the gun was the result of an unconstitutional search.

The trial court denied Kelly's motion to suppress and entered written findings of fact and conclusions of law, incorporating by reference its oral findings and conclusions. Kelly then waived his right to a jury trial and agreed to a trial on stipulated evidence. Based on this evidence, the trial court found Kelly guilty of unlawful possession of a firearm.

Kelly appeals.

## SUBSTANTIAL EVIDENCE

Kelly assigns error to twelve of the trial court's twenty-six findings of fact entered following the CrR 3.6 hearing. None are persuasive.

We review the trial court's findings of fact for substantial evidence.[2] Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.[3]

After a careful review of the record, we hold that the challenged findings are supported by substantial evidence, including abundant testimony provided by

---

[2] State v. Martinez, 135 Wn. App. 174, 179, 143 P.3d 855 (2006).
[3] State v. Levy, 156 Wn.2d 709, 733, 132 P.3d 1076 (2006).

Detectives Rurey and Thomas at the suppression hearing. We reject the arguments to the contrary.

## PRETEXTUAL TRAFFIC STOP

Kelly contends that the trial court erred by concluding that the detectives conducted a lawful traffic stop and that the stop was not pretextual. We disagree. The evidence established that the detectives' decision to initiate the traffic stop was motivated by the transfer of title violation.

Article I, section 7 of the Washington Constitution prohibits unreasonable seizures.[4] A warrantless seizure is per se unreasonable.[5] Evidence obtained in violation of this constitutional provision must be suppressed, and evidence obtained as a result of any subsequent search must also be suppressed as fruit of the poisonous tree.[6]

However, a warrantless seizure is valid if it falls within the scope of one of the narrowly drawn exceptions to the warrant requirement.[7] Investigatory detentions, including warrantless stops for traffic infractions, are a recognized exception.[8] Law enforcement officers may conduct a warrantless traffic stop if they have a reasonable and articulable suspicion that a traffic violation has occurred or is occurring.[9] The State bears the burden of proving by clear and

---

[4] State v. Kennedy, 107 Wn.2d 1, 4, 726 P.2d 445 (1986).
[5] State v. Kinzy, 141 Wn.2d 373, 384, 5 P.3d 668 (2000); State v. Ladson, 138 Wn.2d 343, 349, 979 P.2d 833 (1999).
[6] Kennedy, 107 Wn.2d at 4 (citing Wong Sun v. United States, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).
[7] Ladson, 138 Wn.2d at 349-50.
[8] State v. Rife, 133 Wn.2d 140, 150-51, 943 P.2d 266 (1997); State v. Duncan, 146 Wn.2d 166, 174-75, 43 P.3d 513 (2002).
[9] Ladson, 138 Wn.2d at 349.

convincing evidence that a warrantless seizure falls within an exception to the warrant requirement.[10]

But where the asserted basis for a traffic stop is a pretext for a warrantless investigation, the stop violates article I, section 7 of the Washington constitution.[11] A traffic stop is pretextual if a law enforcement officer makes the stop "not to enforce the traffic code, but to conduct a criminal investigation unrelated to the driving."[12] In this situation, the officer "relies on some legal authorization as 'a mere pretext to dispense with [a] warrant when the true reason for the seizure is not exempt from the warrant requirement.'"[13]

In determining whether a stop is pretextual, courts consider the totality of the circumstances, including "both the subjective intent of the officer as well as the objective reasonableness of the officer's behavior."[14] We review de novo whether a stop is pretextual.[15]

Here, the totality of the circumstances demonstrates that the traffic stop was not pretextual. After hearing extensive testimony, the trial court found that "Detectives Rurey and Thomas decided to make a traffic stop as a result of the title transfer violation" and that "[t]he decision to initiate the traffic stop was

[10] State v. Diluzio, 162 Wn. App. 585, 590, 254 P.3d 218, review denied, 272 P.3d 850 (2011); State v. Doughty, 170 Wn.2d 57, 62, 239 P.3d 573 (2010); State v. Garvin, 166 Wn.2d 242, 250, 207 P.3d 1266 (2009).

[11] State v. Nichols, 161 Wn.2d 1, 9, 162 P.3d 1122 (2007).

[12] Ladson, 138 Wn.2d at 349.

[13] State v. Arreola, 176 Wn.2d 284, 294, 290 P.3d 983 (2012) (quoting Ladson, 138 Wn.2d at 358).

[14] Ladson, 138 Wn.2d at 358–59.

[15] Arreola, 176 Wn.2d at 291.

motivated by [the traffic] violation and observation."[16] These facts reflect the detectives' subjective intent to stop the Mercedes because of the traffic violation.

Additional evidence indicates that when the detectives followed the Mercedes, they were not investigating any criminal activity other than the traffic violation. According to the detectives' testimony, other than the transfer of title violation, nothing led them to believe that the occupants were involved in criminal or gang-related activities. Moreover, at the time the detectives entered the license plate into the computer and decided to stop the vehicle, they did not recognize the Mercedes or its occupants from any gang-related or criminal investigations in which they had been involved. Nor did the detectives recognize the occupants once they were able to observe them after making the stop. Furthermore, during the pursuit, the detectives had no information about the identity of the vehicle's occupants and did not take steps to obtain such information.

Nevertheless, Kelly claims that the detectives' delay in initiating the stop— rather than immediately stopping the vehicle upon discovering the transfer of title violation—indicates that they were, in actuality, searching for criminal activity unrelated to the traffic violation. We disagree.

Washington courts have found pretext where law enforcement officers follow a vehicle to search for the commission of criminal conduct.[17] But that did not happen here. The detectives decided to make the stop immediately upon

---

[16] Clerk's Papers at 217.
[17] See, e.g., Ladson, 138 Wn.2d at 346; State v. Montes-Malindas, 144 Wn. App. 254, 257, 182 P.3d 999 (2008); State v. DeSantiago, 97 Wn. App. 446, 450-51, 983 P.2d 1173 (1999).

their discovery of the title transfer violation. Any delay in stopping the Mercedes was attributed to its excessive speed as it traveled down the street and outside of the detectives' view. Even when the detectives sped down the street, they were initially unable to catch up with the Mercedes. Only when the Mercedes stopped at a traffic light were the detectives in a position to make the traffic stop, approximately three minutes after they decided to investigate the transfer of title violation.

Indeed, the facts here are similar to those in Nichols. There, the law enforcement officer "immediately pursued the vehicle after he saw what he believed to be several infractions and activated his lights as soon as he caught up with it."[18] The supreme court rejected the defendant's claim that the stop was pretextual.[19] In so doing, the court distinguished the facts in that case from Ladson, DeSantiago, and Myers, cases in which courts determined pretext existed.[20] In those cases, the court explained, the stops were pretextual because the "officers suspected criminal activity and followed vehicles waiting for commission of a traffic infraction so the vehicle could be stopped."[21] Like Nichols and unlike the pretext cases, the detectives here began to pursue the Mercedes immediately after discovering the transfer of title violation. They activated their emergency lights as soon as they caught up to the Mercedes at the intersection. This stop was not pretextual.

---

[18] Nichols, 161 Wn.2d at 12.

[19] Id.

[20] Id. at 11-12 (citing Ladson, 138 Wn.2d at 346; DeSantiago, 97 Wn. App. at 452; State v. Myers, 117 Wn. App. 93, 97, 69 P.3d 367 (2003)).

[21] Nichols, 161 Wn.2d at 12.

Kelly next asserts that, because the detectives were gang unit officers and not general patrol officers, they were actually looking for criminal activity. In so contending, Kelly attempts to draw parallels between the gang unit officers in Ladson and the detectives here. This argument is unpersuasive.

In Ladson, the gang unit officers who conducted the traffic stop admitted to following the vehicle in order to look for a reason to stop it.[22] Because the officers' suspicion about the driver's rumored drug involvement was the actual motivation for finding a legal reason to stop him, the supreme court held that the stop was pretextual.[23]

Kelly's reliance on Ladson is misplaced. As discussed above, the detectives did not pursue the Mercedes to search for criminal activity. Nor did they harbor any gang-related suspicions that motivated the traffic stop. Notwithstanding these factual discrepancies between Ladson and the present case, Kelly's argument fails for two reasons.

First, whether the detectives were gang unit officers and not patrol officers is not considered a dispositive factor in determining whether a traffic stop is pretextual.[24] The detectives provided substantial evidence evincing that their responsibilities as gang unit officers include routine patrol duties and traffic enforcement. Detective Rurey testified that although his focus is on gang-related activity, his responsibilities are varied and include traffic enforcement, responding to 911 calls, and conducting criminal investigations that are not gang related. On

---

[22] Ladson, 138 Wn.2d at 346.
[23] Id. at 346, 360.
[24] See Myers, 117 Wn. App. at 97; DeSantiago, 97 Wn. App. at 452.

cross-examination, Detective Rurey explained that when he observes minor traffic violations, he generally aims to conduct a traffic stop if he is able to do so. Detective Thomas's testimony confirmed that gang unit detectives' duties are not limited to gang-related investigations. He testified that he stops people for traffic violations "[a]s the opportunity arises." Therefore, in light of the totality of the circumstances, the detectives' association with the gang unit does not render the traffic stop pretextual.

Second, Kelly next asserts that because the detectives rarely issue traffic citations since joining the gang unit, the stop was pretextual. But the detectives' testimony proves the contrary.

Detective Rurey testified at the suppression hearing that when he was a patrol officer, he issued many more citations because he had recently graduated from the police academy and hoped to gain experience, and because traffic enforcement was his only duty at the time. Detective Rurey also testified that his position in the gang unit encompasses a wider range of responsibilities and, therefore, he issues fewer citations. Moreover, according to Detective Rurey's testimony, his approach has changed. On the gang unit, he gives more warnings instead of tickets when he makes traffic stops. This is in part because he seeks "positive contact" with individuals when enforcing traffic laws. Therefore, that the detectives seldom issue citations does not indicate pretext.

Kelly argues, finally, that the detectives' actions once they stopped the car suggest that the stop was pretextual. He points to the fact that Detective Rurey opened the rear passenger door, shone his flashlight to see inside before

No. 69607-6-I/11

questioning the occupants, and later asked Kelly his name, looking for criminal activity. Again, we disagree.

The detectives' conduct reflects their intention to ensure officer safety. At the traffic light, the detectives observed occupants moving around through the Mercedes' rear untinted window. But because of the dark surroundings and the tinted windows, when approaching the vehicle, the detectives were unable to verify how many occupants were inside or determine what they were doing. The detectives did not know whether the occupants possessed weapons or posed a threat to the detectives' safety. Consequently, Detective Rurey opened the passenger door. When he noticed that Kelly and the other rear seat passenger were not wearing seatbelts, he asked for their names. The detectives' actions are not indicative of an attempt to investigate criminal activity unrelated to the traffic violation.

Under the totality of the circumstances surrounding the traffic stop, we hold that the detectives, both objectively and subjectively, were motivated by the need to investigate the traffic violation. The traffic stop was not a pretext.

**SEIZURE OF KELLY**

Kelly argues in the alternative that Detective Rurey's request for his identification while Kelly was a passenger in the traffic stop was an unlawful seizure. He argues further that the firearm evidence should be suppressed. We disagree.

"Under article I, section 7... passengers are unconstitutionally detained when an officer requests identification 'unless other circumstances give the

- 11 -

police independent cause to question [the] passengers.'"[25] Such circumstances include the failure to wear a seat belt, a traffic infraction.[26] Moreover, "[w]henever any person is stopped for a traffic infraction, the officer may detain that person for a reasonable period of time necessary to identify the person."[27]

Here, during the traffic stop, the detectives noticed that Kelly was not wearing a seat belt. Their reasonable suspicion that Kelly committed this infraction gave the detectives independent cause to question him. According to Detective Rurey's testimony, he requested Kelly's identification because he "was committing his own, independent law violation." The detectives therefore had the authority to detain Kelly for a reasonable period of time in order to identify him. Kelly was not unlawfully seized.

## SEIZURE OF FIREARM

Kelly contends that the detectives had no lawful basis to seize the firearm. We disagree and hold that the seizure of the gun was lawful.

Kelly first argues that Detective Rurey had no basis to request Kelly's identification, and without such identification, he would not have known that the gun was contraband. As we already discussed in this opinion, Detective Rurey lawfully requested Kelly's identification. Thus, this contention is meritless.

Kelly next asserts that that the seizure of the gun was a result of an unlawful search incident to arrest. Kelly did not make this argument to the trial

---

[25] State v. Rankin, 151 Wn.2d 689, 695, 92 P.3d 202 (2004) (quoting State v. Larson, 93 Wn.2d 638, 642, 611 P.2d 771 (1980)).
[26] State v. Chelly, 94 Wn. App. 254, 259-60, 970 P.2d 376 (1999); RCW 46.61.688(3).
[27] RCW 46.61.021(2).

court. Instead, in an unchallenged conclusion of law, the trial court justified the seizure under the plain view exception:

> Within several minutes of the initial stop, Detective Rurey saw the gun ***in plain view without any intrusive or unlawful search.*** Detective Rurey never entered the car prior to seeing the gun. The use of a flashlight and Detective Rurey's movement outside of the Car to get the best view possible of the interior of the Car was not an unlawful search.[28]

By stating that Detective Rurey saw the firearm "in plain view without any intrusive or unlawful search" the trial court misapplied the plain view doctrine, mistaking it for the open view doctrine. "Whereas a 'plain view' situation involves an officer viewing an item *after a lawful intrusion into* a constitutionally protected area, 'open view' involves an observation from a nonconstitutionally protected area."[29] Thus, a lawful seizure of the evidence observed in plain view "'must turn on the legality of the intrusion that enable[d the detective] to perceive and physically seize the property in question.'"[30]

Here, Detective Rurey intruded upon a constitutionally protected area when he opened the rear passenger door. But such an intrusion is permissible within the scope of a proper Terry stop.

A proper Terry stop permits police officers to conduct a limited protective search of the passenger compartment.[31] The protective search of a vehicle must be predicated on an officer's reasonable suspicion that the suspect is dangerous

---

[28] Clerk's Papers at 220 (emphasis added).

[29] Kennedy, 107 Wn.2d at 10.

[30] Id. at 9 (quoting Texas v. Brown, 460 U.S. 730, 737, 103 S. Ct. 1535, 75 L. Ed. 2d 502 (1983)).

[31] State v. Larson, 88 Wn. App. 849, 850-51, 946 P.2d 1212 (1997); see Terry v. Ohio, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

and may gain access to a weapon in the vehicle.[32] Additionally, the "protective search for weapons must be objectively reasonable, though based on the officer's subjective perception of events."[33] The existence of an objectively reasonable concern for officer safety is determined by evaluating the entire circumstances of the stop.[34]

Detectives Rurey and Thomas conducted a limited protective search that was justified by their concern for safety. When approaching the Mercedes, the detectives' view of the interior was obstructed, precluding their ability to assess any possible threat from the passengers inside. Given the detectives' concerns for safety, opening the door was objectively reasonable. Thus, this intrusion was proper. Furthermore, Detective Rurey immediately recognized the handgun that was within Kelly's reach.[35] Seizing that firearm was lawful.

The trial court did not err by denying Kelly's motion to suppress.

We affirm the judgment and sentence.

Cox, J.

WE CONCUR:

Becker, J.

---

[32] State v. Glossbrener, 146 Wn.2d 670, 680-81, 49 P.3d 128 (2002).
[33] Larson, 88 Wn. App. at 853-54.
[34] Glossbrener, 146 Wn.2d at 679.
[35] See State v. Hatchie, 161 Wn.2d 390, 395, 166 P.3d 698 (2007) ("A plain view search is legal when the police (1) have a valid justification to be in an otherwise protected area and (2) are immediately able to realize the evidence they see is associated with criminal activity.").