**FILED**
**MARCH 17, 2015**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31794-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LARRY GENE MARQUETTE, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — After a traffic stop, law enforcement officers seized

methamphetamine and drug paraphernalia from Larry Marquette's car. The trial court

convicted Marquette of one count of possession of a controlled substance with intent to

deliver. On appeal, Marquette argues that evidence seized inside the car and an

inculpatory statement made at the time of the seizure should be suppressed. He also

challenges the chain of custody of the methamphetamine. We affirm the trial court's

denial of the motions to suppress and affirm the conviction.

FACTS

On the afternoon of April 4, 2012, Spokane County Deputy Sheriff Jeff Thurman observed Larry Marquette drive eastbound on I-90. Marquette exited the freeway at the Argonne Street exit from the fourth lane, without signaling. The fourth lane gives the option to continue on I-90 or exit, and the fifth lane is an exit only lane. Thurman followed Marquette off the freeway and northbound onto Argonne before turning on his emergency lights at the intersection of Argonne and Knox.

When Deputy Jeff Thurman activated his patrol car's emergency lights, he observed Marquette immediately reaching toward his seat, which Thurman characterized as a furtive movement. Thurman took this furtive movement seriously and requested assistance.

Larry Marquette drove in the far left lane of Argonne. He later testified that he did not immediately pull his car to the side because of considerable traffic and the absence of a safe place to stop. When Marquette failed to stop at the intersection with Knox, Deputy Thurman activated his siren and followed Marquette's car to the Montgomery intersection, where Marquette turned left and stopped in a dirt lot. Marquette testified that he saw the dirt lot and signaled to the officer by pointing toward the lot out his car window while waiting to turn left on Montgomery. Washington State Patrol Trooper Kristopher Stone coincidentally saw Deputy Thurman's car's emergency lights and pulled into the lot as Thurman physically restrained Marquette.

2

Larry Marquette and Deputy Jeff Thurman disagree about the events that occurred

after the stop in the dirt lot. At the suppression hearing, Thurman testified:

> [Thurman]: I quickly exit my vehicle to try to get control of the driver to have him show me his hands, because I don't know if he's trying to retrieve or conceal a weapon. I noticed, in my peripheral vision, a trooper car pulling up. I approached the driver's door of the vehicle, I tell Mr. Marquette to show me his hands, he showed me his hands. I open the door of his car. I tell him—have him exit the car. When he exits the car, I immediately take control of his hands because I don't know if he has weapons on his person.
>
> [By Prosecutor]: Could I stop you there? When you say take control of his hands, how are you doing that?
>
> A. Basically took his arm, placed it behind his back into a handhold, and walked him back to my patrol scar [sic].
>
> . . . .
>
> As I was walking—as I had him exit the car, Trooper Stone . . . came over to the side with me, the driver's side. As I was walking Marquette back, Mr. Marquette back to my patrol car, I told Trooper Stone to conduct a frisk of the—underneath the driver's seat for any weapons.
>
> Q. Okay. What did you do with Mr. Marquette then?
>
> A. I walked him to the front of my patrol car, asked him what he was trying to hide. He said he was trying to get his cell phone. I told him that I was gonna frisk him down for weapons. I asked him if he had any weapon on his person, he said no. And then I asked him if I could search his person, he said yes. And about that same time, Trooper Stone walked up to me and said that he didn't enter the vehicle. He said he observed what appeared to be a baggy of methamphetamine on the floorboard of the car on the driver's side.
>
> Q. What do you do when Trooper Stone gives you that information?
>
> A. I advised Mr. Marquette he was under arrest. I placed him into custody and detained him in handcuffs.
>
> Q. What do you did at that point?
>
> A. At that point I placed him into the back seat of my patrol car. I had Trooper Stone stand with him. I walked up to the vehicle, I looked in from the outside, confirmed what Trooper Stone saw, I walked back to Mr. Marquette.
>
> Q. And when you get back there, what do you do?

3

A. Had him—I took him back out of the patrol car and I continued to read him his *Miranda* rights, which he said—at first he said he did not understand them. And I told him that I didn't want to play any games, he looked like he was an educated man. And he said, "All right, I don't want to play games either." And he continued to tell me he did understand his rights.

Q. Okay. And then you obtained consent to search?

A. Then I obtained consent to search the vehicle. Also gave him a consent to search card, which advised him he has the right to refuse, restrict or revoke the search. He understood and he also gave consent to search the vehicle.

Q. Okay.

A. I unhandcuffed his hand at that time and allowed him to sign both cards.

Q. Who did the search of the vehicle?

A. I did.

Report of Proceedings (RP) (Oct. 18, 2012) at 62-65.

Larry Marquette testified at the suppression hearing:

[Marquette]: . . . The deputy came up and opened my car door and told me to get the F out of the car, right.

[Counsel]: Let me stop you there and go back a minute. While you were driving in the distance between I-90 and where you stopped, okay.

. . . .

Were you making any movements with your hands?

A. Yeah; I was looking for my cell phone.

. . . .

And it's a stick shift so, I mean, it's a five speed.

Q. Where were you looking for—what point in the car or on you were you looking for your cell phone?

A. Well my car's—it's probably in my seat and coat pockets 'cause I was wearing two coats.

Q. All right. Okay. So let's jump forward again to where we just left off prior to that question. The deputy approaches your car. And what's said?

A. He opened the car door and told me to get the F out of the car.

Q. Okay. What did you do or say, if anything?

A. I held up my hand and said, "Easy, tough guy, it ain't that serious."

. . . .

At which point he grabbed my arm and pulled me out of the car and took me and put me down on his car. And I told him, "Man, there's no need to get violent." He says, "If I was getting violent, you'd be on the ground." I'm like, "Okay."

Q. How did he—in what manner did he put you on the car?

A. Arm behind the back and like—yeah, like I was resisting him, which, you know.

Q. Were you standing? Were you bent over?

A. I was bent over, face down on his car, yes.

Q. Was it one hand behind your back? Or both?

A. Well, he first had the one, then he took the other, yeah.

Q. Okay. What happened next?

A. He says what was I looking for, I said my cell phone.

. . . .

And then he told the other officer to look under the seat.

. . . .

I told him, "Under Arizona v. Gantz (Phonetic), you can't search my car, I've been removed."

Q. Now what happened after the—I'm not asking you what was said, necessarily, but what happened after the officer looked into your car?

A. The other officer came up and said there was some meth in there.

Q. All right. Were you then arrested?

A. Yeah. He had put the cuffs on me when he put me on the car.

. . . .

Q. Before the other officer went and looked at the car?

A. Yeah.

. . . .

Q. All right. Okay. Were the doors of the police car opened or closed?

A. Closed.

Q. All right. Were you able to get out of that car?

A. Absolutely not, no.

Q. Why not?

A. Cause I was in handcuffs and, I mean, the door's closed to the car.

5

RP (Oct. 18, 2012) at 24-27.

Deputy Thurman found one cell phone in the passenger seat and another in Marquette's pocket. The cell phone removed from Marquette's person rang in excess of ten times while Deputy Thurman spoke to Marquette.

Jeff Thurman testified he obtained consent to search the vehicle and released the handcuffs long enough for Larry Marquette to sign a consent to search card and a *Miranda* waiver card. Thurman testified that Marquette was evasive at first, stating he did not understand the rights being read to him, but that he ultimately cooperated. According to Thurman, Marquette stated he used methamphetamine that morning and officers would find a baggie of methamphetamine on the driver's floorboard. Thurman searched Marquette's car and found

> the same bag that Trooper Stone advised me of on the floorboard, driver side floorboard front. There was a knife next to it. It appeared that the front edge of it had been cut off. The same white crystal substance that I recognized from my training and experience as methamphetamine was, also, on the seat, itself, the driver seat.
> On the passenger seat, there was a black bag that contained several small bindle baggies that are commonly used to package drugs from my training and experience, a cell phone and then the stereo system in the vehicle appeared it had been removed multiple times. I was able to just barely pull on it, and it came all the way out.
> There was another bag stuffed behind that that contained the same type of packaging materials and baggies that was in the bag on the passenger seat were, also, inside the bag that was behind the stereo.
> There was, also, a white crystal substance that I recognized as methamphetamine in there and a scale inside there that had a white crystal residue on it.

RP (Apr. 15, 2013) at 25-26.

Deputy Sheriff Jeff Thurman testified that after he completed the search, he returned to his patrol car to question Marquette, who told him he was on probation and sold methamphetamine "here and there" to make ends meet. RP (Apr. 15, 2013) at 27. According to Thurman, Marquette said he did not want to speak with drug detectives, but told Thurman the bag of methamphetamine found behind the stereo would contain about an eighth of an ounce. Thurman summoned a tow company to impound Marquette's car, but he later cancelled the impound after Marquette asked if a friend with a tow truck could retrieve the car. Thurman testified that he allowed the friend to tow the car because Marquette was cooperative. Thurman also testified that, based on his training and experience, Marquette appeared to be high on methamphetamine because of rapid speech.

In contrast, Larry Marquette testified he told Deputy Thurman three or four times that he did not want him to search the car and, under *Arizona v. Gant*, the deputy could not search it. Marquette averred that Thurman remarked that suspects did not usually "throw case law" at him and that he would impound the vehicle and procure a search warrant anyway. RP (Apr. 15, 2013) at 45-46. Marquette told Deputy Thurman that he could not afford to pay to retrieve the car from impound and needed the car to visit his ill mother. Marquette testified Thurman said, "you let me search it. I will see what I can do for you." RP (Apr. 15, 2013) at 47. Marquette declared that Thurman told him that, if he

7

would talk about the drugs found behind the stereo, Thurman would try to limit the

charges to being in possession rather than possession with intent to deliver.

## PROCEDURE

The State of Washington charged Larry Marquette with one count of possession of

a controlled substance with intent to deliver. Marquette filed a CrR 3.6 motion to

suppress the methamphetamine and other evidence obtained via the warrantless search of

his vehicle, arguing (1) no exceptions to the warrant requirement applied, (2) the traffic

stop was pretext for an unrelated criminal investigation, and (3) Marquette's consent to

search the vehicle was not validly obtained.

The trial court heard testimony and argument on the CrR 3.6 motion and denied it.

The trial court entered, in part, the following findings of fact:

> 6. Deputy Thurman approached the driver, later identified as Larry Gene Marquette, and ordered him to show his hands. The defendant complied. The deputy ordered the defendant to get out of the car. The defendant complied. The driver's door remained open. Deputy Thurman placed the defendant in handcuffs and escorted him next to his patrol car. Deputy Thurman asked the defendant what he had been doing reaching under the driver's seat. The defendant replied that he was reaching for his cell phone. Deputy Thurman asked the defendant if he had any weapons on his person and the defendant replied no.
> 7. Trooper Christopher Stone of the Washington State Patrol arrived to assist the deputy. The deputy asked the trooper to look under the seat; however the trooper did not look under the seat.
> 8. Trooper Stone went to the open door. He saw what he believed to be a baggie of methamphetamine on the front driver's side floorboard. The trooper did not enter the car. He returned to Deputy Thurman and told him what he had observed. Deputy Thurman arrested the defendant.

9. Deputy Thurman advised Mr. Marquette of his Miranda warnings. The defendant indicated that he understood his rights. The deputy read a search consent card to the defendant. The defendant signed the card. The deputy searched the car and seized items of evidence.

Clerk's Papers (CP) at 130-31.

Based on its findings, the trial court entered, in part, the following conclusions of law after the CrR 3.6 hearing:

3. There was no search of the vehicle, as defined by the Washington State or United States Constitution, by Trooper Stone. The car door was open. The car was in a public area. The trooper was in a public area. The trooper saw the baggie in open view when he was in a place where he was authorized to be.
4. Deputy Thurman advised the defendant of his Miranda and Ferrier warnings. The defendant consented to the search of the car. The evidence was seized after the defendant gave consent to search. There was no violation of Arizona v. Gant.

CP at 131.

Larry Marquette filed a CrR 3.5 motion to suppress the statements that Deputy Jeff Thurman alleged he uttered after his arrest. Marquette argued: (1) a CrR 3.5 hearing was needed to determine whether a proper *Miranda* warning preceded his statements, and (2) his statements were involuntary under the Fourteenth Amendment and inadmissible for any purpose. After hearing testimony and argument, the trial court orally ruled

the statements Mr. Marquette made were valid statements. They were even though custodial, he was advised of his rights.
As far as the statements was he offered something in exchange for waiving his rights, even though they're Mr. Marquette's own testimony that when he told the deputy he couldn't search, the deputy said he was going to tow it and get a search warrant, which is his right to tow the car and get a

search warrant.

Mr. Marquette had said he couldn't afford it. He didn't want to get it out. So whether Mr. Marquette made that offer, I did not find that the deputy offered that in lieu of him waiving his rights based on Mr. Marquette's own testimony.

The Court is still going to find that they were knowingly, voluntarily and they were consensual at the time for waiving his rights.

RP (Apr. 15, 2013) at 70-71.

The trial court did not enter written findings of fact or conclusions of law in support of the denial of the CrR 3.5 motion until one year after the hearing and after Marquette filed his opening brief in the present appeal.

The criminal charge proceeded to a bench trial. Spokane County Sheriff Deputy Jeff Thurman again testified that, during his search of Larry Marquette's car, he found two small baggies of methamphetamine on the floorboard, two small baggies of methamphetamine behind the car stereo, and a small scale with white residue in a nylon bag behind the car stereo. Thurman also found a black nylon bag on the passenger seat that contained a cell phone, address book, and empty small bindle baggies with little green alien skulls printed thereon. Thurman testified that the bags found on the floorboard and the bindle baggies were 1" x 3/4" in size.

At trial, Deputy Thurman testified that, after he finished his search of the car, he spoke with Larry Marquette, who told him of 1/8 of an ounce of methamphetamine behind the car stereo. Thurman declared that the cell phone found on Marquette's person rang multiple times while they were waiting for Marquette's friend to come and tow his

car.

At trial, Deputy Jeff Thurman testified he labeled and placed in separate evidence bags: exhibit (1) the crystalline substance found in the baggies on the floorboard and behind the car stereo, exhibit (2) the digital scale, exhibit (3) empty baggies and cellophane found behind the car stereo, exhibit (4) the black nylon bag found behind the car stereo, exhibit (5) a small red address book and the cell phones found on Larry Marquette's person and on the passenger seat, and exhibit (6) the black nylon case found on the passenger seat, still holding the bindle baggies with green alien skulls printed on them. Thurman placed all the items into a secure storage bin in the county sheriff's property room.

Jeff Thurman testified at trial that, before booking the evidence, he weighed at 0.2 grams the methamphetamine found on the floorboard and at 1.6 grams the methamphetamine found behind the stereo. Thurman used a scale from the sheriff department's property room to weigh the methamphetamine. He cleaned the scale before use. Thurman testified that the 1.6 grams found behind the stereo of the car was close to an eighth of an ounce, or about 2.29 grams.

Detective Lloyd Hixson of the Spokane County Sheriff's Drug Unit testified that he transported exhibits 1 through 6 to the Washington State Patrol Crime Laboratory on June 15, 2012, two and one-half months after the seizure of the evidence. Trevor Allen, a forensic scientist at the Washington State Patrol Crime Laboratory, testified that Alex

11

Seaboalt received exhibit 1 containing the methamphetamine on that same day. Alex Seaboalt did not testify at trial. Allen testified that, although he could not remember the time of day he first handled the methamphetamine, he received exhibit 1 with its original seal from the sheriff's office intact, and that he did not see any other openings in its bag.

Trevor Allen testified at trial that he found two sealed zip lock bags in the exhibit 1 folder. He also testified that he took the crystalline substance out of one bag numbered 002 and weighed it at 5.81 grams. In addition, Allen testified that, on June 27, 2012, he conducted gas chromatography and microcrystalline tests to confirm the crystalline substance was a combination of methamphetamine and dimethyl sulfone, a lawful dietary supplement. Allen followed the same process for the second bag, numbered 003, and determined that it also held methamphetamine cut with dimethyl sulfone weighing 0.21 grams. Allen then repackaged exhibit 1, sealed the evidence bag, and dated it. Allen testified he conducted the same process on the plastic bags found in exhibit 3, and discovered trace amounts of methamphetamine. On July 11, 2012, Allen prepared a draft report of his test results, which he sent for peer review. The review occurred on July 16, 2012.

At trial, Larry Marquette questioned Deputy Jeff Thurman about the discrepancy between the weights he recorded for the methamphetamine he recovered from Marquette's car and the weights recorded by Trevor Allen at the Washington State Patrol

12

Crime Laboratory Thurman testified "Apparently, I wrote down the wrong number or read the scale wrong." RP (Apr. 16, 2013) at 181.

When the State of Washington moved to admit exhibits 1 and 3 into evidence, Larry Marquette objected. He argued that the State could not lay a proper foundation for admission or comply with the confrontation clause absent testimony from Alex Seaboalt, the evidence custodian who received the exhibits from Detective Lloyd Hixon. Marquette also argued that the State had not properly accounted for the discrepancy in weights respectively taken by the Spokane County Sheriff's Office and the Washington State Patrol's Crime Laboratory. The State countered that issues of contamination or disparity in evidence go to weight and not admissibility, and that Alex Seaboalt's absence did not violate the confrontation clause. The trial court ruled in favor of the State and admitted exhibits 1 and 3. The court reasoned that *Washington v. Campbell*, 103 Wn.2d 1, 691 P.2d 929 (1984) holds that minor gaps in the chain of custody go to weight and not admissibility.

Larry Marquette brought a halftime motion to dismiss and a motion to dismiss at the close of the State's case in chief. Marquette argued that the State lacked sufficient evidence to prove intent to deliver, based on corpus delicti, lack of corroboration, and unreliability of the weight of the methamphetamine found in Marquette's car. The trial court denied both of Marquette's motions.

The trial court found Larry Marquette guilty of possession of a controlled

substance with intent to deliver. The court made an oral ruling with several findings of

fact and concluded that the State proved all the elements of the charge:

> The issue then comes down to did he possess it with an intent to
> deliver. The Court looks at the evidence that Deputy Thurman testified to.
> He stated Mr. Marquette told him he had no job, but he had bought a car for
> $500. He had $612 in cash on him, two cell phones with one continuously
> ringing, the address book, the scale with residue, the bindles and the
> baggies, the additional baggies.
>
> Based on all of that, the Court would find without a reasonable doubt
> Mr. Marquette possess[ed] a controlled substance. With the admission of
> selling the meth and made the $2,000 in the last two months, the Court
> would have to find that Mr. Marquette is guilty of the crime as charged.
>
> The Court did go through on the difference. Obviously, I looked at
> the pictures. One of the things is a gram is a lot smaller than I envisioned
> it. Even though I've seen them in trial, it's usually the jury that gets to look
> at the evidence closely. I actually got to look at the evidence. A gram is a
> lot smaller than expected.
>
> Deputy Thurman never testified that the scale that he used at the
> property room was certified. He did say he could have misread the scale or
> transposed the number.
>
> When the Court looks at the totality, all of the witnesses testified the
> envelopes appeared to be in the same condition, the pictures, also, showing
> the size and the actual drugs, themselves. Even the less than 6.2 grams is a
> small amount in consideration compared to what I had expected. The Court
> did note that.
>
> Deputy Thurman did say he wiped down the scale. There was
> nothing on it at the time he weighed it. Deputy Hixson, Deputy Thurman
> and the crime lab, Mr. Allen, all testified that they all appeared to be in the
> same condition as when they had it.

RP (Apr. 18, 2013) at 227-29.

After trial, the trial court entered no written findings of fact or conclusions of law.

After Larry Marquette filed his opening appellate brief, the trial court entered findings of

fact and conclusions of law for both the CrR 3.5 hearing and the trial. The findings for

disputed facts at the CrR 3.5 hearing read, in relevant part:

> 2. Mr. Marquette understood his <u>Miranda</u> rights. He testified that the reason that he said he didn't understand his rights was because he was angry and knew that he was going to jail anyway.
> 3. Deputy Thurman did not offer anything to Mr. Marquette in exchange for his waiver of rights. Deputy Thurman would have ordered an impound of the car so that he could apply for a search warrant. Deputy Thurman had the right to impound it for that reason. Mr. Marquette said that he couldn't afford to get the car out if it were impounded. The deputy did not offer something to the defendant to get him to waive any rights.

CP at 254. The trial court entered one conclusion of law for the CrR 3.5 hearing:

> The statements made by Mr. Marquette to Deputy Thurman were made after Mr. Marquette had been advised of his <u>Miranda</u> warnings and after Mr. Marquette made a knowing, intelligent and voluntary waiver of those rights, as shown by his signing the rights card. The statements are admissible at trial.

CP at 254.

## LAW AND ANALYSIS

*Issue 1: Whether the trial court's entry, after the appeal, of findings of fact and conclusions of law for the trial and the CrR 3.5 hearing demands relief on appeal for Larry Marquette?*

*Answer 1: No.*

Larry Marquette assigns error to the trial court's failure to enter written findings of

fact and conclusions of law at the end of the bench trial and after the hearing on his CrR

3.5 motion to suppress. The State responds that the assigned error is now moot since the

15

trial court later entered findings and conclusions filed with this court after Marquette filed his opening brief. Marquette did not file a reply brief addressing whether he still assigns error to the trial court's initial omissions. We agree with the State that the issue is moot.

CrR 3.5(c) reads:

> After the hearing, the court shall set forth in writing: (1) the undisputed facts; (2) the disputed facts; (3) conclusions as to the disputed facts; and (4) conclusion as to whether the statement is admissible and the reasons therefore.

CrR 6.1(d) provides:

> In a case tried without a jury, the court shall enter findings of fact and conclusions of law. In giving the decision, the facts found and the conclusions of law shall be separately stated. The court shall enter such findings of fact and conclusions of law only upon 5 days' notice of presentation to the parties.

Both court rules require entry of written findings of fact and conclusions of law after their respective hearings. The failure to enter written findings of fact and conclusions of law as required by CrR 6.1(d) requires remand for entry of written findings and conclusions. *State v. Head*, 136 Wn.2d 619, 624, 964 P.2d 1187 (1998). Reversal may be appropriate where a defendant can show actual prejudice resulting from the absence of findings and conclusions or following remand for entry of the same. *Head*, 136 Wn.2d at 624. This court will not infer prejudice from a delay of entering such findings and conclusions. *Head*, 136 Wn.2d at 625. That burden lays with a defendant. *Head*, 136 Wn.2d at 625.

16

A case is technically moot if the court can no longer provide the basic relief originally sought. *Snohomish County v. State*, 69 Wn. App. 655, 660, 850 P.2d 546 (1993). Here, the trial court entered written CrR 6.1(d) and CrR 3.5(c) findings of fact and conclusions of law on May 1, 2014, and the State timely added them to the appellate record. Remand serves no purpose, since the trial court would repeat the same entry. Thus, the issue is moot. Larry Marquette has asserted no prejudice by reason of late entry of the findings and conclusions, so reversal is not warranted.

*Issue 2: Whether the trial court erred in denying Marquette's CrR 3.6 motion to suppress items obtained in the warrantless search of his car?*

*Answer 2: No.*

Larry Marquette contends the trial court erred in denying his motion to suppress the evidence obtained during the search of his car. Marquette specifically assigns error to the trial court's written conclusion of law 4: "Deputy Thurman advised the defendant of his <u>Miranda</u> and <u>Ferrier</u> warnings. The defendant consented to the search of the car. The evidence was seized after the defendant gave consent to search. There was no violation of <u>Arizona v. Gant</u>." CP at 131. Marquette argues: (1) Trooper Kristopher Stone's visual observation of the bag of methamphetamine on the car floorboard was not sufficient to justify a warrantless search of Marquette's vehicle, and (2) Marquette's consent to search the vehicle was not given freely and voluntary. We rule that Trooper Stone's observations of methamphetamine inside the car rendered the search of the car lawful.

17

Therefore, we affirm the trial court's denial of Marquette's CrR 3.6 motion to suppress without addressing whether Marquette consented to the search.

We review a trial court's denial of a CrR 3.6 suppression motion to determine whether substantial evidence supports the trial court's challenged findings of fact and, if so, whether the findings support the trial court's conclusions of law. *State v. Cole*, 122 Wn. App. 319, 322-23, 93 P.3d 209 (2004). Challenged findings entered after a suppression hearing that are supported by substantial evidence are binding, and, where the findings are unchallenged, they are verities on appeal. *State v. O'Neill*, 148 Wn.2d 564, 571, 62 P.3d 489 (2003). Larry Marquette does not challenge any of the findings of fact entered by the trial court upon denying the motion to suppress evidence. Therefore, we base our ruling on the facts found by the lower court.

Larry Marquette argues that Trooper Stone's and Deputy Jeff Thurman's observation of a bag of what appeared to be methamphetamine on the car floorboard during a safety check of the car does not satisfy the open view exception to the warrant requirement of article I, section 7 of the Washington Constitution. Marquette may be correct that the open view doctrine does not apply. Nevertheless, if the open view exception does not apply, the plain view exemption does.

Searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment and article I, section 7 of the Washington State Constitution, subject only to a few specifically established and

well-delineated exceptions. *Arizona v. Gant*, 556 U.S. 332, 338, 129 S. Ct. 1710, 173 L. Ed. 2d 485 (2009); *State v. Duncan*, 146 Wn.2d 166, 171, 43 P.3d 513 (2002). Washington allows a few jealously and carefully drawn exceptions to the warrant requirement, which include exigent circumstances, searches incident to an arrest, inventory searches, plain view searches, open view searches, and *Terry* investigative stops. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The State bears the burden of demonstrating that a warrantless seizure falls into a narrow exception to the rule. *State v. Doughty*, 170 Wn.2d 57, 61, 239 P.3d 573 (2010).

The plain view doctrine deems a seizure reasonable when: (1) there is a prior justification for intrusion by a law enforcement officer into the accused's sphere of privacy, (2) the officer inadvertently discovers contraband, and (3) the officer immediately knows the contraband is evidence of a crime. *State v. Chrisman*, 100 Wn.2d 814, 819, 676 P.2d 419 (1984); *State v. Claflin*, 38 Wn. App. 847, 853, 690 P.2d 1186 (1984). The plain view doctrine, however, does not justify the initial intrusion into the protected area. *State v. Kennedy*, 107 Wn.2d 1, 9, 726 P.2d 445 (1986). The officer must have some legitimate reason to be in a place not open to the public. In contrast, under the "open view" exception, the officer espies evidence of a crime while in an area open to the public, alternatively called a nonconstitutionally protected area. *State v. Seagull*, 95 Wn.2d 898, 901-02, 632 P.2d 44 (1981). If an officer sees evidence of a crime in a

public area, the officer has not even conducted a search for purposes of the constitution.

*State v. Kennedy*, 107 Wn.2d at 10 (1986).

In *Kennedy*, our Supreme Court explained the difference between "plain view"

and "open view."

> Whereas a "plain view" situation involves an officer viewing an item after a lawful intrusion into a constitutionally protected area, "open view" involves an observation from a nonconstitutionally protected area. *State v. Seagull*, 95 Wn.2d 898, 901–02, 632 P.2d 44 (1981). Hence, if an officer, after making a lawful stop, looks into a car from the outside and sees a weapon or contraband in the car, he has not searched the car. Because there has been no search, article [I], section 7 is not implicated. Once there is an intrusion into the constitutionally protected area, article [I], section 7 is implicated and the intrusion must be justified if it is made without a warrant.

107 Wn.2d at 10. (emphasis omitted).

State Patrolman Kristopher Stone spotted the methamphetamine inside Larry

Marquette's car before Deputy Jeff Thurman saw the drugs. Stone did not enter the car,

but observed the drug by looking inside the car. The car was parked in a dirt lot and

conceivably anyone could walk by the car, look inside, and notice the white crystalline

substance. In other words, the evidence could have been in open view. To give

Marquette the benefit of the doubt, however, we will analyze the seizure of the drug as if

the plain view exemption applies.

Under Washington case law, the plain view exemption justified the search and

seizure of the methamphetamine. Larry Marquette's failure to signal his turn supported

Deputy Thurman's stop of Marquette's vehicle. Marquette's furtive move inside the car validated Trooper Stone's sweep of the area under Marquette's car seat. To sweep that area, Stone necessarily needed to approach the car. Thus, Stone was justified to be near or against the car when he inadvertently saw the white powder and immediately knew the powder to be methamphetamine.

A *Terry* stop and frisk may extend into the car if there is a reasonable suspicion that the suspect is dangerous and may gain access to a weapon in the vehicle. *State v. Glossbrener*, 146 Wn.2d 670, 680, 49 P.3d 128 (2002). When police conduct a *Terry*-like search of a vehicle, the scope of the search should be sufficient to assure the officer's safety. *Kennedy*, 107 Wn.2d at 12. A protective search for weapons must be objectively reasonable, though based on the officer's subjective perception of events. *Glossbrener*, 146 Wn.2d at 681.

In *State v. Kennedy*, the Supreme Court held an officer's search of the area under the driver's seat of a car pulled over on suspicion of its driver having just purchased marijuana was reasonable as a *Terry* frisk. The officer observed the driver make a furtive movement prior to being pulled over, and a passenger sat in the front seat while the stop was made. The Court held that our constitution allowed the officer to make a limited search of the passenger compartment to assure a suspect person in the car does not have access to a weapon within the suspect's or passenger's area of control. *Kennedy*, 107 Wn.2d at 13. Because the officer was legitimately within the automobile's front seat, the

21

marijuana discovered in the officer's sweep under the seat fell under the plain view warrant exception.

Fourteen years later, the Supreme Court refined this standard in *Glossbrener*, holding that an officer's *Terry* frisk of a car after the officer witnessed the driver make a similar "furtive gesture" was not objectively reasonable based on the intervening actions of the officer and driver. *Glossbrener*, 146 Wn.2d at 681. The officer did not conduct the *Terry* frisk of the car until after Glossbrener told the officer that his movements were made in an attempt to hide an open container of alcohol, the officer conducted a field sobriety test on Glossbrener and frisked his person, and the officer allowed Glossbrener to sit in the car while the officer checked for warrants.

The *Glossbrener* Court contrasted Glossbrener's case with *State v. Larson*, 88 Wn. App. 849, 856-57, 946 P.2d 1212 (1997), where this court upheld as reasonable an officer's *Terry* frisk of a vehicle after the driver was out of the vehicle, where the officer saw the driver make a similar furtive gesture prior to pulling over. The Court found the cases distinguishable because, unlike in *Glossbrener*, Larson would have returned to his vehicle to retrieve his car registration and could have gained access to a weapon the officer suspected he hid by the furtive gesture. *Glossbrener*, 146 Wn.2d at 684.

Larry Marquette's case is more like *Larson* than *Glossbrener* because, like *Larson*, Marquette was stopped for a traffic infraction, and would need to access his car again to retrieve his car's registration. Thurman would likely later allow Marquette to

22

drive away in his car. Although Marquette gave a nonthreatening reason for the furtive gesture upon pulling over and complied with Thurman's request to exit the car, this appeal lacks the "intervening actions" that would lead an outsider to doubt an officer's objective concern for his safety. Thurman was justified in asking Trooper Stone to conduct a *Terry* frisk of the car to ensure it was free of weapons.

*Issue 3: Whether the trial court erred in admitting testimony about the chemical composition of evidence, when the arresting officer testified to a measurement of the controlled substance inconsistent with the chemical lab's measurement?*

*Answer 3: No.*

At trial and on appeal, Larry Marquette contends that the trial court improperly admitted evidence of the methamphetamine and drug paraphernalia discovered during the search of his vehicle. He emphasizes a significant discrepancy between the weight of the methamphetamine recorded by Deputy Jeff Thurman and the weight recorded at the Washington State Patrol's Crime Laboratory. He argues that the State must establish a chain of custody with sufficient completeness to render it improbable that the original items taken from the car had been exchanged with another or been contaminated or tampered with. Marquette contends that the weight discrepancy destroys the chain of custody. In response, the State of Washington contends that gaps in the chain of custody go to weight, not admissibility. We agree with the State.

23

Before a physical object connected with the commission of a crime may properly be admitted into evidence, it must be satisfactorily identified and shown to be in substantially the same condition as when the crime was committed. *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960); *State v. Campbell*, 103 Wn.2d 1, 21, 691 P.2d 929 (1984). Factors to be considered include the nature of the article, the circumstances surrounding the preservation and custody of it, and the likelihood of intermeddlers tampering with it. *State v. Campbell*, 103 Wn.2d at 21. The proponent need not identify the evidence with absolute certainty and eliminate every possibility of alteration or substitution. *State v. Campbell*, 103 Wn.2d at 21. Identity and condition of an exhibit are always subject to rebuttal. *State v. Music*, 79 Wn.2d 699, 713, 489 P.2d 159 (1971), *vacated in part on other grounds*, 408 U.S. 940, 92 S. Ct. 2877, 33 L. Ed. 2d 764 (1972). The jury is free to disregard evidence upon its finding that the article was not properly identified or there has been a change in its character. *State v. Campbell*, 103 Wn.2d at 21. However, minor discrepancies or uncertainty on the part of the witness will affect only the weight of evidence, not its admissibility. *State v. Campbell*, 103 Wn.2d at 21. The trial court is necessarily vested with a wide latitude of discretion in determining admissibility, which will not be disturbed absent clear abuse. *State v. Campbell*, 103 Wn.2d at 21; *Kiessling v. Nw. Greyhound Lines, Inc.*, 38 Wn.2d 289, 295, 229 P.2d 335 (1951).

The State presented evidence showing the transfer of custody of the

methamphetamine from the Spokane Sheriff's Office to the Washington State Patrol's Crime Laboratory. This believable evidence defied suggestions that the methamphetamine measured by the laboratory was different from the methamphetamine seized from Larry Marquette's car. The trial court heard no testimony questioning the credibility of the crime lab chemist who tested and verified the methamphetamine. The trial court reviewed photos of the samples and the samples themselves, and determined that the discrepancy in measurements was likely one of transcription by Deputy Thurman. The trial court was thus well within its discretion in admitting the exhibits.

Larry Marquette urges this court to apply a more stringent test in light of *State v. Roche*, 114 Wn. App. 424, 59 P.3d 682 (2002). That case has little application here.

In *State v. Roche*, this court granted James Roche a new trial after uncovered evidence showed that the Washington State Patrol chemist who testified in his case divested and ingested the heroin samples he tested at the crime lab. This court held that a rational trier of fact could reasonably doubt the chemist's credibility, and thus the State needed to relay the foundation for admitting the test results against Roche at a new trial.

*State v. Roche* is a unique and hopefully one-of-a-kind case. Other than the differences in measurements, the credibility of the lab chemist and arresting officer here are not challenged with regard to taking the measurements. Contrary to Marquette's argument, no heightened standard should apply.

*Issue 4: Whether sufficient evidence supported a conviction for possession with intent to deliver a controlled substance?*

*Answer 4: Yes.*

Finally, Larry Marquette contends the State failed to meet its burden in proving he possessed methamphetamine with intent to deliver, in violation of RCW 69.50.401. RCW 69.50.401(1) provides, in relevant part: "Except as authorized by this chapter, it is unlawful for any person to manufacture, deliver, or possess with intent to manufacture or deliver, a controlled substance."

This assignment of error repeats but restates Larry Marquette's chain of custody argument. Marquette contends that the statute requires proof beyond a reasonable doubt that possession and intent to deliver refer to the same quantity of the controlled substance in question, and that the State cannot meet this burden as the quantity reported by Deputy Thurman is substantially different than the amount reported by the Washington State Patrol Crime Laboratory. We reject the argument for the reasons given earlier. We also question the validity of the argument because Marquette fails to identify the measurement to be used for purposes of his possession and the measurement to be used for purposes of his anticipated delivery.

Evidence is sufficient if, viewed in the light most favorable to the State, any rational trier of fact could find the essential elements of the crime charged beyond a reasonable doubt. *State v. Robbins*, 68 Wn. App. 873, 875, 846 P.2d 585 (1993). A

26

defendant challenging sufficiency of the evidence at trial admits the truth of the State's evidence and all reasonable inferences therefrom. *State v. Witherspoon*, 180 Wn.2d 875, 883, 329 P.3d 888 (2014).

Larry Marquette is correct that the State must prove a defendant possessed the same controlled substance he intended to deliver. *Robbins*, 68 Wn. App. at 876. However, the State met that burden here. Although the two weighings of methamphetamine differed, the trial court considered the discrepancy and found it did not call into question the validity of the evidence. The trial court also considered the attendant circumstances and found the evidence sufficient to reasonably infer intent to deliver. Those circumstances included small baggies, a scale, cash, and a repeatedly ringing cell phone in Marquette's possession. Sufficient evidence supports the conviction.

## CONCLUSION

We affirm the trial court's denial of Larry Marquette's motion to suppress evidence and motion to suppress his inculpatory statement. We affirm his conviction.

No. 31794-3-III
*State v. Marquette*

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Brown, A.C.J.

_____
Lawrence-Berrey, J.