

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 34229-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HAROLD NEVILLE BARTON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — In *State v. Walker*, 129 Wn. App. 572, 119 P.3d 399 (2005)

(*Jacqueline Walker*[1]), this court affirmed a motion to suppress evidence where a traffic

stop arising from an automobile title transfer violation could not be justified as a *Terry*[2]

stop or as a stop to issue a citation or make an arrest.  It could not be justified as a *Terry*

stop because "there was simply nothing to investigate"—the officer had already

ascertained that the title transfer violation had occurred.  *Jacqueline Walker*, 129 Wn.

---

[1] We refer to the case as *Jacqueline Walker* to distinguish it from *State v. Walker*, 157 Wn.2d 307, 312-19, 138 P.3d 113 (2006), cited herein.
[2] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

App. at 577. Instead, the officer believed he was authorized to stop the car to issue a citation or make a warrantless arrest but he was not—the violation was a completed misdemeanor, committed outside his presence. *See* RCW 10.31.100.

In this appeal, Harold Barton misreads *Jacqueline Walker* as holding that an officer can never conduct a *Terry* stop to investigate a misdemeanor committed outside his presence unless it is identified by RCW 10.31.100 as an exception to the requirement for an arrest warrant. The opinion contains some ambiguous language but read as a whole, it is limited to the situation where an officer's knowledge "eliminate[s] the possibility the officer stopped the car to investigate." *Jacqueline Walker*, 129 Wn. App. at 577.

The officer making the *Terry* stop that Mr. Barton challenges was legitimately investigating a reported crime. Because suppression of the evidence was not warranted and Mr. Barton fails to demonstrate prejudice from allegedly ineffective assistance of counsel, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

Officer Matthew Keetch was on patrol on the evening of July 14, 2015, when he received a call from an employee of a nearby supermarket, who reported a "theft incident." Clerk's Papers (CP) at 3. A male customer with a cart of merchandise had passed all points of sale without making any attempt to pay and was stopped at the exit. The customer then claimed to have forgotten his wallet and, leaving the cart behind,

2

quickly left in an older Ford pickup, white with a grey stripe on its side. The supermarket employee described the truck and told the officer that it was just leaving the store parking lot, headed south. The store employee would later provide an affidavit that he watched the man, who had a cart "packed full of product" and had been "walking around the store for a while." CP at 46. It was when the man started walking at a fast pace straight toward the exit that the employee "caught him as he got to the front door." CP at 47.

Officer Keetch arrived quickly and spotted a Ford truck matching the employee's description, which he pulled over. He explained the reason for the stop to the truck's driver, who identified himself as Harold Barton. Mr. Barton repeated his claim that he failed to pay for merchandise at the supermarket because he forgot his wallet. The officer ran a check on the truck's license plate, which was reported as issued to a Ford F-150 that was maroon in color. Further investigation of the truck's vehicle identification number revealed that it was reported stolen a few days earlier by its registered owner, Bryan Decamp. A search of the truck's interior consented to by Mr. Decamp led to the discovery of Mr. Decamp's rear license plate behind the rear jump seat of the truck.

Officer Keetch arrested Mr. Barton for possession of a stolen motor vehicle. He noted in his police report that Mr. Barton "immediately denied any involvement" in the theft of the truck, saying he "must have been scammed by the person(s) who allegedly sold [it to] him"—a woman Mr. Barton knew named Cynthia and her companion, Jake. CP at 26. Mr. Barton showed the officer a handwritten bill of sale dated July 10, 2015,

3

that was purportedly signed by Cynthia Decamp. Mr. Barton claimed that Ms. Decamp

had prepared the bill of sale and, accompanied by Jake, had delivered the truck to him in

a Safeway parking lot on July 10. Officer Keetch determined in a call to Mr. Decamp

that his wife Cynthia passed away in the fall of 2014.

Before trial, Mr. Barton moved to suppress the evidence obtained as a result of

Officer Keetch's stop.[3] He emphasized two facts: first, that the supermarket employee

told Officer Keetch that the male customer left without taking any property from the

store, and second, that Officer Keetch told a defense investigator that he initially detained

Mr. Barton because he believed he might have secreted something in his pockets. The

defense contended that Officer Keetch had made a *Terry* stop that was unlawful because

it was based on mere speculation rather than articulable facts, specific to Mr. Barton, that

would indicate he was involved in criminal activity.

At the hearing, the defense asserted that the State was arguing there was probable

cause for the stop, not that the *Terry* standard applied. The State's brief is not a part of

our record, but the prosecutor's argument at the hearing for the most part analyzed the

seizure as a *Terry* stop. The prosecutor referred to Officer Keetch's "reasonable

---

[3] There were actually two suppression hearings; in the first, the court suppressed evidence that was found in Mr. Barton's backpack, which officers opened while searching the truck interior with Mr. Decamp's consent. Report of Proceedings (RP) (Suppression Hearings) at 3-13. Only the second suppression hearing and decision are at issue on appeal.

4

*suspicion*." Report of Proceedings (RP) (Hearings)[4] at 22 (emphasis added). Summarizing, she told the court that Officer Keetch "believed that there was an issue with someone attempting to steal from [the supermarket]. *So he investigated further*," adding that the supermarket employee "was trying to help the officer seek out this person *to investigate further*." *Id.* at 23 (emphasis added). At one point, however, the prosecutor equated "reasonable suspicion" with that which "would lead an officer to believe that a crime had been committed." *Id.* at 22 (emphasis added).

The court denied Mr. Barton's motion to suppress. In orally ruling, it discounted an "urban legend[ ] . . . that you can't arrest anybody for theft or shoplifting unless they get out the door," stating "it is pretty well established that the exertion of an authorized control over the property of another can certainly occur within the four walls of a mercantile establishment." *Id.* at 24. It analyzed the stop in probable cause terms, finding that the supermarket employee's report that Mr. Barton had proceeded "past the points of sale and [was] somewhere near the door when he's challenged or stopped by an employee" was sufficient. *Id.* "Objectively speaking," the court stated, "regardless of

---

[4] Several independently page-numbered volumes of reported proceedings are included in our record. We refer to the volume that contains suppression hearings taking place on September 24 and October 29, 2015, as "RP (Hearings)" and the volume that contains trial proceedings taking place on November 10, 12 and 13, 2015, as "RP (Trial)."

the officer's subjective belief at the time, I think that there is probable cause to stop for either third-degree theft or an attempted third-degree theft." *Id.* at 25. The court later entered written findings of fact and conclusions of law, concluding "[t]here was probable cause to stop the listed vehicle for a theft third or attempted theft third." CP at 75.

Mr. Barton's jury trial began on Tuesday, November 10, 2015, before a different judge. That morning, the trial court conducted a CrR 3.5 hearing on the admissibility of statements made by Mr. Barton during what the court consistently referred to as Officer Keetch's "*Terry* stop" of the truck Mr. Barton was driving. *See* RP (Trial) at 43-44 ("[T]his is a *Terry* stop. Nobody has asserted it's not a *Terry* stop . . . . The officer has a right to make an examination to determine whether a crime has been committed and the identity of the individual he's talking to. It is all part of *Terry*."). Jury selection began in the afternoon, was completed, and the opening instruction was read.

Following a hiatus for Veteran's Day, trial resumed on Thursday, November 12, and both parties completed presentation of their available witnesses before noon. Mr. Barton's lawyer chose to make her opening statement at the outset rather than reserve it until the conclusion of the State's case. In addition to telling jurors they would hear from Mr. Barton about purchasing the truck from someone he knew as "Cindy," the defense lawyer told jurors that "Mr. Barton was not the only one present" when he obtained the

6

key and bill of sale. RP (Trial) at 186, 188. She told jurors that Shannon Bristlyn[5]—

"[who] isn't Mr. Barton's girlfriend, she isn't Mr. Barton's family. She's just a

neighbor"—was also present for the purchase of the truck from Cindy "and she'll testify

today as well." *Id.* at 186.

The State called only four witnesses. Mr. Decamp's daughter placed the

disappearance of the truck at no earlier than 10:45 p.m. on July 10, and a neighbor placed

it at around 6 a.m. on July 11, too late to support Mr. Barton's July 10 bill of sale. Mr.

Decamp and Officer Keetch also testified for the State.

When it came time for the defense case, Mr. Barton testified on his own behalf,

but Ms. Bristlyn did not show. After all the other evidence had been presented and the

jurors had been excused for lunch, the following exchange took place between the trial

court and Mr. Barton's lawyer:

> THE COURT: Did you actually get a hold of [Ms. Bristlyn] or your
> office get a hold of her?
> [DEFENSE COUNSEL]: I've been trying to get a hold of [Randall],
> my investigator. I do not know if he was able to get a hold of her Tuesday.
> I called this morning to check in on the number that I have and I was able
> to speak to a gentleman. He said he would leave work and go make sure
> that she knows she needs to be here at, I said 11:00. He said she knew she
> had court today and was planning on being here, so I'm hoping he is
> bringing her over.
> . . . .

---

[5] A list of defense witnesses spells the name Shannon *Bristlin* but the briefs mostly use *Bristlyn*, tracking the spelling reflected in the reports of proceedings. We will employ that spelling as well.

> THE COURT: . . . What if she doesn't show up. Is that it?
>
> [DEFENSE COUNSEL]: She's under subpoena, judge. I don't know what other options or recourse I have for her.
>
> THE COURT: You can ask her to be identified as a material witness and get a warrant for her. But I don't know that I'm going to be inclined to stop the case, because I'd have to stop the case.
>
> [DEFENSE COUNSEL]: . . . If the court won't mind, I would like to consult with some of my betters to figure out what to do in this matter.
>
> THE COURT: One of the things somebody might figure out is to send an investigator out to wherever she is and go get her.
>
> [DEFENSE COUNSEL]: I did that this morning. I told her to go find her and bring her in.

RP (Trial) at 131-33. The trial court then recessed for lunch.

When proceedings resumed at 1:30, the court stated its understanding that the defense lawyer had been unable to locate Ms. Bristlyn, which the lawyer confirmed. With the defense investigator present, the defense lawyer summarized the investigator's and her own efforts to secure Ms. Bristlyn's appearance:

> [DEFENSE COUNSEL]: He did contact Ms. Bristlyn on the 10th and told her she was expected to be here at 1:30. We contacted Ms. Bristlyn again and left information—I'm not sure if he was able to speak with her. Left information with a person at her household she was to be here earlier in the morning as directed. I contacted the person who lives with Ms. Bristlyn today, and he indicated he would go get her and bring her here. [The investigator] also contacted the person who lives with Ms. Bristlyn today.
>
> . . . .
>
> We did subpoena her, and that subpoena was given to her on the 26th of October at 9:30 by [the investigator].

*Id.* at 134. The defense lawyer then asked the court for a material witness warrant for Ms. Bristlyn but added, "I understand the court's indicated it's not inclined to give one in

8

this case." *Id.* at 134-35. She assumed too much, however, because the trial court was willing to further consider whether to issue a warrant and continue trial. It asked the State for its position, and the prosecutor responded, "I'm concerned that she just pled guilty on October 22nd, 2015 to a whole bunch of felonies. I'm just concerned we're never gonna get her." *Id.* at 136. After further discussion about whether Ms. Bristlyn was under Department of Corrections' supervision and might be contacted through them, the court observed that if trial were continued, "I really don't want to do it tomorrow, it's just going to be interrupted. I would have to do it Monday." *Id.* at 138.

At that point, Mr. Barton's lawyer announced she would withdraw the request for a material witness warrant because her client wanted the case submitted to the jury that day. Asked directly by the court, Mr. Barton confirmed that he wanted the request for a material witness warrant withdrawn. The court granted a State request that Ms. Bristlyn not be mentioned in closing argument and both counsel complied.

The jury found Mr. Barton guilty. He was sentenced to 25 months' confinement and 25 months' community custody. He appeals.

## ANALYSIS

### DENIAL OF THE MOTION TO SUPPRESS

Mr. Barton argues the trial court erred in denying his motion to suppress evidence obtained as a result of Officer Keetch's July 14 stop. Relying on this court's decision in *Jacqueline Walker*, he argues first that because attempted third degree theft is not an

9

exception to the arrest warrant requirement imposed by RCW 10.31.100, the officer

unlawfully stopped Mr. Barton on suspicion of that crime, which was a misdemeanor

committed outside the officer's presence. Alternatively, he argues that Officer Keetch

lacked reasonable individualized suspicion to make the stop, having been told by the

supermarket employee that the customer being complained of had not taken anything

from the store.

*RCW 10.31.100 does not limit an officer's*
*authority to make a* Terry *stop*

We first address Mr. Barton's argument that the stop was improper under RCW

10.31.100. Because Mr. Barton does not challenge any of the court's factual findings

made in denying the suppression motion, they are verities on appeal. *State v. Tamblyn*,

167 Wn. App. 332, 337-38, 273 P.3d 459 (2012). At issue is only whether the trial

court's findings support its legal conclusions, an issue we review de novo. *State v.*

*Carneh*, 153 Wn.2d 274, 281, 103 P.3d 743 (2004), *aff'd*, 164 Wn. App. 1033 (2011).

Moreover, we may uphold the trial court's ruling if correct, even if we do so based on

different reasoning. *State v. Hansen*, 107 Wn.2d 331, 334-35, 728 P.2d 593 (1986)

(citing *Ertman v. City of Olympia*, 95 Wn.2d 105, 108, 621 P.2d 724 (1980)).

The arguments on appeal are complicated by the trial court's finding of probable

cause for what we conclude was a *Terry* stop.

Officers must have probable cause to arrest.

The existence of probable cause is determined by an objective standard. *State v. Graham*, 130 Wn.2d 711, 724, 927 P.2d 227 (1996). Probable cause exists when the arresting officer is aware of facts or circumstances, based on reasonably trustworthy information, *sufficient to cause a reasonable officer to believe a crime has been committed*. *State v. Terrovona*, 105 Wn.2d 632, 643, 716 P.2d 295 (1986). At the time of arrest, the arresting officer need not have evidence to prove each element of the crime beyond a reasonable doubt. The officer is required only to have knowledge of facts sufficient to cause a reasonable person to believe that an offense had been committed. *State v. Knighten*, 109 Wn.2d 896, 903, 748 P.2d 1118 (1988).

*State v. Gaddy*, 152 Wn.2d 64, 70, 93 P.3d 872 (2004) (some emphasis omitted). Officer Keetch never arrested Mr. Barton for third degree theft or attempted third degree theft.

An officer need not have probable cause to make an investigative stop. The degree of probability required for a police conclusion that a crime is in progress or has occurred "is less in a stop situation than in an arrest." *State v. Kennedy*, 107 Wn.2d 1, 6, 726 P.2d 445 (1986) (citing 3 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.3 at 65 (1978)). The *Kennedy* court approved a definition of the "articulable suspicion" required to make an investigative stop under article I, section 7 of the Washington Constitution:

LaFave suggests that the standard is a *substantial possibility that criminal conduct has occurred or is about to occur*. We believe this to be the preferred definition. It maintains the ability of law enforcement to deter criminal conduct and yet reasonably safeguards "private affairs." When the activity is consistent with criminal activity, although also consistent with noncriminal activity, it may justify a brief detention.

*Id.* at 6 (emphasis added). The officer's suspicion must be well-founded (i.e., based on specific and articulable facts that the individual has committed a crime) and reasonable.

11

*State v. Doughty*, 170 Wn.2d 57, 63, 239 P.3d 573 (2010) (citing *Kennedy*, 107 Wn.2d at 4-5).

We turn to Mr. Barton's reliance on RCW 10.31.100. That statute codifies and amends a common law rule that an officer may arrest a suspect for a misdemeanor only if the offense was committed in the officer's presence. *State v. Bravo Ortega*, 177 Wn.2d 116, 123, 297 P.3d 57 (2013). It does not effectuate any constitutional warrant requirement for misdemeanor arrests. *State v. Walker*, 157 Wn.2d 307, 312-19, 138 P.3d 113 (2006). The statute provides exceptions to the common law rule, authorizing officers to arrest a suspect for specific, enumerated misdemeanors and gross misdemeanors committed outside the officer's presence. Among the exceptions is "probable cause to believe that a person has committed or is committing a misdemeanor or gross misdemeanor, involving . . . the unlawful taking of property." RCW 10.31.100(1).

Mr. Barton construes the exception for misdemeanors "involving . . . the unlawful taking of property" as meaning only a completed theft, not an attempted theft, and contends that his actions in the supermarket would not amount to a completed theft. He then argues that under this court's decision in *Jacqueline Walker*, because Officer Keetch could not *arrest* him for an attempted theft committed outside the officer's presence under RCW 10.31.100, it also could not conduct a *Terry* stop for the purpose of investigating that crime.

As signaled by our introduction to this opinion, *Jacqueline Walker* involved a distinguishable situation: an officer's ascertainment of a violation that required no investigation. In *Jacqueline Walker*, the officer was running registration checks on passing cars when he determined that the car being driven by Ms. Walker had been sold more than four months earlier, but title had not been transferred. Under former RCW 46.12.101(6)(e),[6] it was a misdemeanor to fail to transfer title within 45 days of a sale. As *Jacqueline Walker* recognized, there was nothing about the title transfer violation that required any further investigation, but the officer initiated a stop of Ms. Walker anyway. Upon discovering that her driver's license was suspended, he arrested her; in a search incident to arrest, he discovered methamphetamine. Charged with a controlled substance violation, she moved to suppress, challenging the lawfulness of the stop. The officer claimed he "[b]eliev[ed] he was authorized to issue a warning or a citation or make a custodial arrest for failure to transfer title." 129 Wn. App. at 574. This court held that the officer lacked authority to cite or arrest under RCW 10.31.100.

The State argued in the alternative that the officer could have conducted a *Terry* stop even if unauthorized to make an arrest, in response to which this court observed, "There was simply nothing to investigate." *Jacqueline Walker*, 129 Wn. App. at 577.

> Before stopping Ms. Walker's car, Officer Meyer was already aware the car
> had been sold more than four months earlier and title to it had not been

---

[6] Presently codified as RCW 46.12.650(7). *See* LAWS OF 2010, ch. 161, § 1211.

> transferred. This knowledge eliminated the possibility the officer stopped the car to investigate the offense.

*Id.* Unfortunate language elsewhere in the opinion appears to tie rejection of the *Terry* stop justification to RCW 10.31.100. But the essential reasoning of the opinion is that a *Terry* stop was not a viable justification in Ms. Walker's case because the officer had nothing to investigate.

That reasoning is consistent with our Supreme Court's relatively recent decision in *Bravo Ortega*, 177 Wn.2d at 130-31, another case applying RCW 10.31.100:

> Simply because an officer is not present during the commission of a misdemeanor, and therefore may not arrest the suspect, does not mean that the officer is powerless to enforce the law. An officer who did not witness a misdemeanor may still stop and detain a person reasonably suspected of criminal activity. *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968); see also [*State v.*] *Duncan*, 146 Wn.2d [166,] 172[, 43 P.3d 513 2002]. In this case, assuming Officer Hockett reasonably suspected that [Bravo] Ortega had committed a criminal act, he could have detained [Bravo] Ortega until Officer McLaughlin arrived to make the arrest. Alternatively, if Officer Hockett lacked even reasonable suspicion of illegal activity, he could have made contact with [Bravo] Ortega and attempted to establish probable cause.

Because RCW 10.31.100 does not limit an officer's authority to make a *Terry* stop, we need not address the State's further arguments that attempted third degree theft is an exception to the warrant requirement under RCW 10.31.100(1) and that the evidence available to Officer Keetch would support his reasonable belief that the crime of third degree theft had been committed.

14

*The challenged stop was lawful under* Terry

Mr. Barton also renews the defense argument made in the trial court that the stop was based on mere speculation that Mr. Barton had taken something from the supermarket, not any articulable facts, specific to Mr. Barton, that would indicate he was involved in criminal activity.

The State attaches unwarranted importance to the declaration of the defense investigator, as if that was the only evidence before the court at the suppression hearing. The investigator provided hearsay testimony that at an interview, Officer Keetch said "it was his impression, that it was possible Mr. Barton could have concealed something in his pockets, although he was uncertain whether this was based on his experience with prior incidents or this one in particular" and it was because of this that he "initial[ly] detaine[d]" Mr. Barton. CP at 73. The investigator did not testify that Officer Keetch offered no other facts or that the officer denied being engaged in an investigation of what had occurred at the supermarket.

There was other evidence. Before the court at the suppression hearing was evidence that a supermarket employee called Officer Keetch directly to report what the employee (by calling police) clearly considered to be a crime or attempted crime. Officer Keetch responded to the scene despite knowing the customer had left the cart behind, from which the court could infer the officer thought further investigation was warranted.

15

The CAD[7] report reflects an "[i]nitial type" crime as "SHOPL," presumably shoplifting. CP at 65.

Officer Keetch's report, prepared the night of the crime, unsurprisingly deals for the most part with the possession of stolen motor vehicle charge that turned out to be the basis for arrest. But he explains that he responded to the area of the supermarket "reference to a theft incident." CP at 3. He reports that the supermarket employee "advised . . . that the male subject had passed by all points of sale and did not make any attempt to pay for the merchandise." CP at 4. His reported questioning of Mr. Barton reveals investigation. His report states that when he stopped Mr. Barton's truck, he "advised the driver the reason for the stop," and that Mr. Barton "confirmed he had just left [the supermarket] after not paying for his selected merchandise, but stated the shopping cart never left the exterior doors." CP at 4. The report also recounts Mr. Barton's statement, when questioned about what had happened at the supermarket, that "he was contacted by a [supermarket] employee about the possible attempted theft incident" but was not detained. *Id.*

The supermarket employee's phone call to Officer Keetch provided sufficient individualized facts about the departing customer for Officer Keetch to suspect that a crime had been committed that warranted further investigation. The officer's report

---

[7] Computer aided dispatch.

16

provides sufficient evidence that he was, in fact, engaged in investigating the theft or attempted theft when he initiated the stop of the truck being driven by Mr. Barton.

INEFFECTIVE ASSISTANCE OF COUNSEL

Mr. Barton's remaining assignment of error is that his trial lawyer was ineffective "for promising witness testimony during opening statement and then failing to secure that witness's presence at trial with a timely material witness warrant." Br. of Appellant at 1. Ineffective assistance of counsel is a manifest error affecting a constitutional right and can be raised for the first time on appeal. *State v. Brown*, 159 Wn. App. 1, 17, 248 P.3d 518 (2010).

Effective assistance of counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. Mierz*, 127 Wn.2d 460, 471, 901 P.2d 286 (1995). To demonstrate ineffective assistance of counsel, a defendant must show two things: "(1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *State v. Thomas*, 109 Wn.2d 222, 225-26, 743 P.2d 816

17

(1987)). When a claim can be disposed of on one ground, this court need not consider both prongs. *Strickland*, 466 U.S. at 697. A claim for ineffective assistance of counsel presents a mixed question of law and fact, which this court reviews de novo. *State v. Cross*, 156 Wn.2d 580, 605, 132 P.3d 80 (2006).

We refuse to consider the assigned error in its twofold form (promising testimony and failing to secure the witness's presence), because nothing in the record indicates that Mr. Barton's trial lawyer promised jurors they would hear from Ms. Bristlyn *knowing* she would appear only if the trial court issued a material witness warrant. We will not assume that was the case. If Mr. Barton believes he has evidence that it was, then his remedy lies in a timely and properly documented personal restraint petition, not this direct appeal. *State v. Freeman*, 118 Wn. App. 365, 382, 76 P.3d 732 (2003), *aff'd*, 153 Wn.2d 765 (2005) (citing *McFarland*, 127 Wn.2d at 338).

The record does reveal that Ms. Bristlyn failed to appear and that Mr. Barton's lawyer did not request a material witness warrant until the conclusion of all other evidence. But Mr. Barton fails to make the essential showing that he was prejudiced by Ms. Bristlyn's failure to appear. There is no evidence in the record that her testimony would have advanced his defense. His lawyer's opening statement is not evidence. Here, too, if evidence exists outside the record that her testimony would have advanced his defense, Mr. Barton can present it through a timely and properly documented personal

18

restraint petition.[8]  Because Mr. Barton fails to demonstrate prejudice, we need not

address whether it was deficient performance not to secure Ms. Bristlyn's presence with a

material witness warrant.

The record also reveals that Mr. Barton's trial lawyer promised Ms. Bristlyn's

testimony.  Again, because there is no evidence that Ms. Bristlyn's testimony would have

been helpful, an assumption that it would have been helpful cannot be part of the

analysis.  But entirely apart from whether a witness would in fact be helpful, it can be

ineffective assistance to promise jurors a witness who never appears.  The *deficiency of*

*the representation* will depend on the strength of the promise and what the lawyer should

have reasonably recognized as the risk of the witness's nonappearance.  Whether the

broken promise of a witness is *prejudicial* will depend on how much importance jurors

attach to the promise of her or his appearance.

In this case, Mr. Barton fails to demonstrate deficient performance.  His lawyer's

promise was not strong.  In fact, at the outset of her opening statement, she told jurors,

> When we present an opening to you, we tell you the story we think you'll
> hear from evidence, and we often tell a different story.  And we presume
> that different evidence is going to be presented to you.

RP (Trial) at 184.

---

[8] In response, the State would have the opportunity to present any evidence that, as it represents, Ms. Bristlyn was a highly impeachable witness.

In addition, there is nothing in the record that demonstrates that Mr. Barton's lawyer should have been concerned that Ms. Bristlyn would fail to appear. The record indicates Ms. Bristlyn was subpoenaed two weeks before trial. It indicates that the defense investigator had direct contact with her about her appearance on November 10, the first day of trial. When her testimony would not take place until the 12th, he had contact with someone in her household and left a message for her to appear on the 12th. This is very different from the facts in *Young v. Washington*, 747 F. Supp. 2d 1213, 1220 (W.D. Wash. 2010), on which Mr. Barton relies. In that habeas corpus case, the defense lawyer did not even subpoena a critical defense witness. The defendant's petition was supported by the absent witness's sworn declaration that if subpoenaed, he would have appeared. *Id.* at 1222.

Where ineffective assistance of counsel is alleged, "[t]o combat the biases of hindsight, our scrutiny of counsel's performance is highly deferential and we strongly presume reasonableness." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Strickland,* 466 U.S. at 688. Mr. Barton does not show that his trial lawyer should have recognized a material risk that Ms. Bristlyn would fail to appear, given that the lawyer and investigator had taken customary, prudent action to secure her appearance. Because Mr. Barton has not demonstrated deficient

20

performance, we need not address whether the representation to jurors that Ms. Bristlyn would testify was prejudicial.

Mr. Barton asks this court to waive costs on appeal if he does not substantially prevail. The State responds that Mr. Barton was found indigent for purposes of appeal and concedes that unless his financial circumstances have improved, the presumption of indigency remains in effect. *See* RAP 14.2. We defer the issue of appellate costs to our commissioner.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:


_____
Lawrence-Berrey, A.C.J.


_____
Korsmo, J.

21